**R. G. LE TOURNEAU, Inc.,**
Petitioner,

v.

**ADMINISTRATOR OF GENERAL
SERVICES, Respondent.**

No. 12458.

United States Court of Appeals
District of Columbia Circuit.

Argued April 29, 1955.

Decided July 21, 1955.

Mr. Mishael O. Gard, Peoria, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Messrs. Timothy W. Swain, Peoria, Ill., and Charles F. Duvall, Washington, D. C., were on the brief, for petitioner.

Mr. James H. Prentice, Atty., Department of Justice, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Samuel D. Slade, Atty., Department of Justice, was on the brief, for respondent. Mr. Harland F. Leathers, Atty., Department of Justice, also entered an appearance for respondent.

Before WILBUR K. MILLER, BAZELON and BASTIAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

This appeal by R. G. LeTourneau, Inc., presents a question concerning the ju-

risdiction of the Tax Court of the United States under the Renegotiation Act.[1] During 1942, 1943 and 1944 LeTourneau and its wholly owned subsidiaries manufactured large quantities of war materials under contracts with the Government. Renegotiation at the end of each year resulted in a contract setting forth an agreed amount of excessive profits realized by the contractor. These amounts, aggregating $13,700,000 for the three years, were repaid by LeTourneau.

To meet its contractual obligations, LeTourneau had constructed certain emergency manufacturing facilities with respect to which it was entitled to accelerated amortization under § 124 of the Internal Revenue Code of 1939, 26 U.S.C.A. So, in computing the excessive profits reflected in the three contracts, the parties deducted amortization on a sixty-month basis as an element of cost. This was a prediction, since the agreements were executed during the sixty-month period, and the parties knew the contractor would become entitled to additional amortization deductions if the President should proclaim the end of the national emergency before it had fully amortized the cost of its facilities and if it should elect to end its amortization period at the same time. Section 124(d), Internal Revenue Code.

The prediction had to be used, however, because Congress had thought it unwise to postpone renegotiation indefinitely merely to await final recomputation of a relatively small item of cost, and had provided in the Act that renegotiation should not be delayed on that account. It was further provided, however, that, "in the case of a renegotiation which is made prior to such recomputation, there shall be repaid by the United States (without interest) to the contractor or subcontractor after such recomputation the amount of a net renegotiation rebate * * *." Section 403(a) (4) (D).[2] It was so provided, notwithstanding the unequivocal language of § 403(c) (4) to the effect that

[1]. Act of April 28, 1942, ch. 247, Title IV, § 403, with various amendments; 50 U.S.C.A.Appendix, § 1191.

[2]. The subsection carefully prescribes the method of computing the rebate:
"* * * There shall first be ascertained the portion of the excessive profits determined by the renegotiation which is attributable to the fiscal year with respect to which a net renegotiation rebate is claimed by the contractor or subcontractor (hereinafter referred to as 'renegotiated year'). There shall then be ascertained the amount of the gross renegotiation rebate for the renegotiated year, which amount shall be an allocable part of the additional amortization deduction which is allowed for the renegotiated year upon the recomputation made pursuant to section 124(d) of the Internal Revenue Code [section 124 (d) of Title 26] in connection with the determination of the taxes for such year and which is attributable to contracts with the Departments and subcontracts, except that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation. The allocation of the additional amortization deduction attributable to contracts with the Departments and subcontracts, and the allocation of the additional amortization deduction to the renegotiated year shall be determined in accordance with regulations prescribed by the Board. There shall then be ascertained the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for the renegotiated year. Such Federal tax benefit shall be the amount by which the taxes for the renegotiated year under Chapters 1, 2A, 2B, 2D, and 2E of the Internal Revenue Code [sections 1 et seq., 500 et seq., former section 600 et seq., section 700 et seq., and former section 710 et seq. of Title 26] were decreased by reason of omitting from gross income (or by reason of the application of the provisions of section 3806(a) of the Internal Revenue Code [section 3806(a) of Title 26] with respect to) that portion of the excessive profits for the renegotiated year which is equal to the amount of the gross renegotiation rebate. The amount by which the gross renegotiation rebate for the renegotiated year exceeds the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for such year shall be the amount of the net renegotiation rebate for such year. * * *" 50 U.S.C.A.Appendix, § 1191(a) (4) (D).

agreements for the elimination of excessive profits shall be conclusive and, except upon a showing of fraud, malfeasance or willful misrepresentation of a material fact, shall not be reopened or modified by any officer, employee or agent of the United States and shall not be annulled, modified, set aside or disregarded in any suit, action or proceeding.

The national emergency ended September 30, 1945, by presidential proclamation and LeTourneau elected under § 124(d) of the Internal Revenue Code, to end its amortization period as of the same date. As the sixty-month period had not then run, LeTourneau became entitled to additional amortization deductions and so to renegotiation rebates with respect to the excessive profits it had theretofore repaid to the Government. Upon claims for such rebates seasonably filed, the Administrator of General Services allowed the aggregate sum of $257,302. Thereupon LeTourneau petitioned the Tax Court to redetermine the amounts of its rebates, alleging the Administrator had erred in the method of computation and that the aggregate rebates should be $533,755.27. The court dismissed for lack of jurisdiction, saying its statutory authority to redetermine the amounts of excessive profits does not include the right to redetermine renegotiation rebates, which is purely an administrative matter. This appeal is from the order of dismissal.

The Tax Court is expressly authorized by the Act to redetermine in a *de novo* proceeding, at the petition of an aggrieved contractor, the amount of excessive profits. This of course includes authority to redetermine deductible costs, and the statute so provides in subsection (a) (4) (B). It follows that, if the Administrator's unilateral determination of LeTourneau's renegotiation rebates was to any extent a determination or redetermination of its excessive profits, the Tax Court clearly had jurisdiction. It is equally true that, if the Administrator's unilateral determination of the rebates involved or included a determination or redetermination of the amount of

a deductible cost incurred by LeTourneau in earning the profits theretofore by agreement found to be excessive, the Tax Court had jurisdiction. For the Administrator's action which affects a part of the process of determining excessive profits affects the whole process. This is in accordance with our holding in Maguire Industries, Inc., v. Secretary of War, 1950, 87 U.S.App.D.C. 356, 185 F.2d 434, a case in which, like this one, the Tax Court dismissed for lack of jurisdiction, but for a different reason. We said, 87 U.S.App.D.C. at page 357, 185 F.2d at page 435:

"We think Congress provided a comprehensive scheme * * * for Tax Court review of unilateral determinations of excessive profits. In our opinion the Secretary did make a determination 'with respect to a fiscal year ending before July 1, 1943,' within the meaning of those words in the statute. Action that affects a part affects the whole and, in many contexts, may be said to be done 'with respect to' the whole. * * * "

The term "renegotiation rebate" is itself significant when its components are analyzed. The word "renegotiation" describes the statutory process of determining the amount, if any, of excessive profits. The word "rebate" means reduction, abatement, diminution—specifically, a payment back of a sum or quantity previously collected; it has no significance apart from the antecedent to which it relates. The term "renegotiation rebate" is therefore a reduction, abatement or diminution of previously recovered excessive profits, and the computation of the amount of the rebate is *pro tanto* a recomputation of the amount of excessive profits. Consequently the initial determination of the amount of the rebate is, in part at lease, an administrative redetermination of excessive profits. It is a necessarily postponed step in renegotiation. It should be noted in this connection that the statute says the renegotiation rebate shall be "repaid" by the Government. The use of

the word "repaid" stamps the rebate as a refund of a portion of the money paid by the contractor and so links it with the amount of excessive profits.

It should also be observed that the agreements between LeTourneau and the Government for 1943 and 1944 (the years for which rebates were claimed and partially allowed), after substantially repeating the statutory declaration that contractual determinations of excessive profits shall be final, provided as follows: "Nothing contained in this agreement shall prejudice any right the Contractor may have to recover a renegotiation rebate pursuant to subsection (a) (4) (D) of the Renegotiation Act."

We cannot suppose that, having set up the comprehensive scheme for Tax Court review of unilateral action in renegotiation cases to which we referred in the Maguire Industries case, Congress intended the final administrative step in the determination of excessive profits to be immune from review.

In our opinion the Tax Court erred in dismissing the petition for lack of jurisdiction.

Reversed and remanded.