R. G. LeTourneau, Inc., Petitioner, *v.* Administrator of General Services, Respondent.

Docket No. 907–R.   Filed January 30, 1958.

*Timothy W. Swain, Esq.,* and *Mishael O. Gard, Esq.,* for the petitioner.

*James H. Prentice, Esq.,* and *Harland F. Leathers, Esq.,* for the respondent.

Atkins, *Judge:* The respondent allowed claims for net renegotiation rebates for the calendar years 1942, 1943, and 1944 in the respective amounts of $2,163.21, $87,717.10, and $167,421.69.   The petitioner alleges that the respondent erred in failing to allow net renegotiation rebates for those years in the respective amounts of $18,039.38, $159,808.61, and $355,907.28.

Upon the first presentation of this case we granted the respondent's motion to dismiss for want of jurisdiction.   We held that under section 403 of the Renegotiation Act a renegotiation rebate is to be handled as an administrative matter over which this Court has no jurisdiction.   22 T. C. 490.   On appeal, the United States Court of Appeals for the District of Columbia reversed our decision, held that the Tax Court has jurisdiction, and remanded the case for further proceedings, 226 F. 2d 48.   The case is now before us for decision on the merits.

The principal issue is whether the petitioner, a parent corporation, is entitled to renegotiation rebates based upon accelerated amortization which is attributable to emergency facilities owned by subsidiaries.

### FINDINGS OF FACT.

Some of the facts were stipulated and are incorporated herein by this reference.

The petitioner is a California corporation organized in 1929. Its principal office is in Longview, Texas. R. G. LeTourneau was its principal incorporator and has been its president ever since its incorporation. It has engaged in the manufacture of heavy earth-moving equipment, sometimes referred to herein as road machinery, and during World War II it fulfilled a number of ordnance contracts relating to manufacturing and machining shell and shell forgings, sometimes referred to herein as munitions.

The road machinery equipment built by the petitioner was of unique design, and most of the designing was done by R. G. LeTourneau. Many patents were issued to him covering his inventions. He also designed a lathe used in machining 155 mm. shells, and at the request of the Armed Forces, a number of special tools and equipment for the war effort.

A majority of the petitioner's shares of stock was owned by R. G. LeTourneau from the date of incorporation until 1935 when he conveyed 200,000 of the 225,000 shares then outstanding to the LeTourneau Foundation. The foundation was organized in 1935 by R. G. LeTourneau as a nonprofit corporation, for religious purposes, under the laws of California.

The petitioner's capitalization was increased from time to time. On December 31, 1940, it had outstanding 450,000 shares of common stock and 30,000 shares of convertible preferred stock, all having full voting rights. The foundation owned 66.4 per cent of the total outstanding voting shares and this percentage of ownership continued through the year 1944. During the same period R. G. LeTourneau owned 1,000 shares of stock in his own name.

In 1935 the petitioner acquired and constructed additional manufacturing facilities at Peoria, Illinois, and shortly thereafter moved its general offices to that city from Stockton, California.

In 1938 additional expansion took place in Toccoa, Georgia. On November 28, 1938, LeTourneau Company of Georgia, sometimes herein referred to as the Georgia company, was incorporated under the laws of Georgia with an original capitalization consisting of 2,000 shares of common stock with a par value of $100 each. The incorporators were R. G. LeTourneau, his wife Evelyn LeTourneau, and an attorney for R. G. LeTourneau. The original capital of the

Georgia company was advanced by the foundation which owned all of the capital stock. There were a number of reasons for incorporating and operating in Georgia, including legal reasons, decentralization of manufacturing operations, local community relations, community prestige, and assistance to students of a local college.

On December 1, 1938, the petitioner and the foundation entered into a written agreement by which the foundation agreed to furnish the capital for the operation of the Georgia company. The petitioner agreed that its principal officers and other executives would assist in organizing the Georgia company and in supervising its activities until January 1, 1948, without cost to the Georgia company; to sell to the Georgia company the machinery, tools, and equipment to be used in the new plant at a price not less than book value; to use its buying power and credit on behalf of the Georgia company; and to grant leaves of absence to certain of its key employees in order that they might enter the employ of the Georgia company and to assist the Georgia company in all details of organization and subsequent operation. The foundation granted to the petitioner the exclusive right to purchase from the Georgia company all machines, equipment, and other merchandise which the Georgia company should manufacture or produce at prices to be agreed upon, but not greater than actual cost plus 15 per cent. The foundation also granted the petitioner the exclusive right to purchase all of the capital stock of the Georgia company at par value plus interest at the rate of 1½ per cent per annum, at any time until January 1, 1948.

From November 28, 1938, until October 10, 1939, the foundation financed the Georgia company through funds advanced by the petitioner. On October 10, 1939, the petitioner purchased all of the capital stock of the Georgia company from the foundation at the foundation's cost. Thereafter the petitioner advanced funds directly to the Georgia company and took in return that company's demand notes with no interest. The debt owing to the foundation by the Georgia company on that date in the amount of $900,000 was assigned to the petitioner. By reason of periodic advances from the petitioner to the Georgia company the debt of the Georgia company to the petitioner was increased to $1,300,000 by December 31, 1939; to $2,600,000 by December 31, 1940; to $4,350,000 by December 31, 1941; and to $7,350,000 by December 31, 1944. The petitioner continued to own all of the stock of the Georgia company until the dissolution of the company in 1950.

On April 14, 1942, the LeTourneau Company of Mississippi, hereinafter called the Mississippi company, was incorporated under the laws of Mississippi. The incorporators were R. G. LeTourneau, Evelyn LeTourneau, and an employee of the petitioner. The capitalization of the Mississippi company consisted of 500 shares of

common stock with a par value of $100 per share. The Mississippi company purchased land and a manufacturing plant near Vicksburg, Mississippi. The original capital and funds for the purchase of the land and buildings were advanced by the petitioner. As in the case of the Georgia company, reasons for incorporating in Mississippi included legal reasons and local community relations.

On August 10, 1942, the Georgia company purchased the entire capital stock of the Mississippi company. At the same time the Mississippi company sold all of its personal property, fixtures, and equipment to the Georgia company and retained title only to the real estate and improvements. The real estate and improvements were leased by the Mississippi company to the Georgia company for a yearly rental equal to the amount of all maintenance costs, repairs, depreciation, amortization, taxes, and other expenses allowable for Federal income tax purposes. The amounts of the rentals were to be determined and billed to the Georgia company following the close of the corporate books of the Mississippi company for each fiscal year. The period of the lease was for the duration of the war or national emergency. The Georgia company took possession of and operated the Vicksburg plant under the lease throughout the remainder of the year 1942 and the years 1943 and 1944.

From the date of the incorporation of the Mississippi company until its dissolution in 1950, its business was solely that of leasing the land and plant in Mississippi to the Georgia company. Its only income was the rentals paid it by the Georgia company, and its expenses were repairs, depreciation, amortization, and taxes. Its income exactly equaled its expenses, and it had no profits for the years 1942, 1943, and 1944. In its Federal income and declared value excess-profits tax returns for those years it reported that it had no net income. In each of those returns it claimed a deduction for amortization of emergency facilities.

R. G. LeTourneau was the president and a director of the petitioner, of the Georgia company, of the Mississippi company, and of the foundation from their respective dates of incorporation throughout their corporate existences, and in the case of the foundation and the petitioner he has continued to be president and a director until the present time. Evelyn LeTourneau was a director of each of the several corporations and vice president of the petitioner, the Georgia company, and of the Mississippi company for similar periods of time, except that she resigned the office of vice president of the Georgia company on October 17, 1942.

R. G. LeTourneau and his wife constituted a majority of the governing board of the foundation, and LeTourneau held the foundation's proxies to vote the stock of the petitioner and of the Georgia company while the latter's stock was owned by the foundation. He

controlled the voting of the stock of both the Georgia and Mississippi companies at all times and as a consequence he controlled the election of directors and selection of key personnel. He also controlled production and supervised the operations of the corporations by weekly visits to each of them. He determined the financial policies of the corporations. He and his wife constituted a majority of the board of directors of each corporation.

The general administrative matters of all three corporations were handled in the petitioner's offices in Peoria. The Georgia and Mississippi companies had no sales force. Operations at their plants were confined to manufacturing. All of such manufacturing, except under the munitions contracts of the Georgia company, was for the petitioner. Their manufacturing operations were directed by the petitioner. Corporate minutes for the Georgia and Mississippi companies were prepared by the petitioner in its Peoria offices. All policy matters were determined by the petitioner.

During the years 1942 through 1944 the petitioner held renegotiable prime contracts and subcontracts for earthmoving equipment, and, in addition, it engaged in nonrenegotiable sales of earthmoving equipment to industry. The petitioner performed some of the renegotiable contracts and manufactured some of the earthmoving equipment sold to industry at its Peoria plant. The Georgia company performed some of the work on the petitioner's renegotiable contracts for earthmoving equipment, and manufactured some of the earthmoving equipment sold to industry at its Georgia plant and at the plant leased from the Mississippi company. The Georgia company did not have any prime contracts with the United States for earthmoving equipment, nor did it sell any earthmoving equipment to industry. The Georgia company held renegotiable prime contracts with the United States for the machining of shell forgings and the petitioner held renegotiable contracts for the manufacture of other munitions. The petitioner performed its contracts for such munitions at its Peoria plant, and the Georgia company performed all the work on its contracts for the machining of shell forgings at its Georgia plant and in the Mississippi plant. The receipts and accruals from the Georgia company's prime shell-machining contracts were recorded as sales on its books. The costs and expenses, including amortization attributable to the Georgia company's performance of shell-machining operations, were segregated on its books from its costs and expenses which were attributable to the manufacture of earthmoving equipment. For each of the years 1942, 1943, and 1944 the Georgia company reported net income in its income and declared value excess-profits tax returns. In each return it claimed a deduction for the amortization of emergency facilities.

The net sales shown on the Georgia company's returns were derived from two sources. One source was the receipts and accruals from shell contracts. The other was sales to the petitioner, at cost, of the entire earthmoving equipment output of the Georgia company. The expenses shown on the returns consist of the total costs of the Georgia company including rentals paid to the Mississippi company. The returns reflected the book profit from the shell-manufacturing operations which consisted of the excess of the income received from those operations over the segregated costs thereof. The Georgia company paid the tax due on all such profit realized.

The Georgia company sold its entire production of earthmoving equipment and parts to the petitioner at cost. Some of the production was in the form of completed units and was shipped directly to the petitioner's customers, and some represented parts which were shipped to the petitioner as components to be used in units manufactured by the petitioner.

The petitioner also manufactured earthmoving equipment components at its Peoria plant, some of which it sold, at cost, to the Georgia company and shipped to the Georgia plant or the Mississippi plant. Such components were incorporated into completed machines which were then invoiced back to the petitioner at the Georgia company's total cost. The completed machine would be sold and invoiced by the petitioner to the ultimate purchaser. Purchasers were never invoiced by the Georgia company except in the case of shells manufactured by it for the United States.

In connection with the Georgia company's performance of work on the petitioner's renegotiable and nonrenegotiable earthmoving equipment contracts and subcontracts, the Georgia company, by individual invoices at the time of shipment, billed the petitioner for all elements of expense, including amortization, and rentals paid to the Mississippi company, which were attributable solely to the earthmoving equipment manufacturing operations. The billings represented the Georgia company's inventory value of the shipments and consisted of labor, material, and overhead cost, including amortization computed over a period of 60 months. Additional billings were made to the petitioner monthly for adjustment in inventory values, if any, which were known at that time and again at the end of the fiscal year for adjustments which were ascertainable after a physical inventory was taken. During the years 1942 to 1945 there were many thousands of direct billings from the Georgia company to the petitioner in the form of invoices.

The petitioner reported net income in its income and declared value excess-profits tax returns for each of the years 1942, 1943, and 1944.

In each of such returns a deduction was claimed for amortization of emergency facilities.

The petitioner secured 27 certificates of necessity for emergency facilities under various dates from March 10, 1941, to January 31, 1944. The Georgia company secured 34 certificates of necessity on various dates from May 7, 1941, to January 21, 1944. The Mississippi company secured 2 certificates of necessity under dates of March 23, 1943, and February 2, 1944. On December 19, 1945, each of the three companies notified the Commissioner of Internal Revenue of its decision to terminate the amortization of such emergency facilities as of September 30, 1945, and accelerated amortization was allowed. By separate letters later issued the three companies were notified that the following amounts had been allowed as amortization deductions for the years 1942, 1943, and 1944.

| Year | Petitioner | Georgia company | Mississippi company |
|------|-----------|-----------------|---------------------|
| 1942 | $316,921.87 | $441,646.11 | $6,051.44 |
| 1943 | 555,841.56 | 720,847.31 | 78,282.95 |
| 1944 | 780,516.18 | 873,867.48 | 104,600.49 |

Early in 1946 the accelerated amortization on all emergency facilities owned by the Mississippi company was invoiced by that company to the Georgia company as additional rent. The Georgia company passed on to the petitioner a portion of such additional cost representing the segregated amortization of the Mississippi company's facilities used in manufacturing road machinery for the petitioner. The Georgia company also billed the petitioner for accelerated amortization on road machinery facilities owned by it at the Mississippi plant and also at its Georgia plant.

## Renegotiation Proceedings.

By agreement dated April 23, 1943, between the petitioner and the United States it was found that the sum of $4,700,000 represented excessive profits realized by the petitioner in the year ended December 31, 1942, under prime contracts with the War, Navy, and Treasury Departments described in an attached exhibit, and under subcontracts also described in an attached exhibit. The agreement referred to a list of the subsidiaries of the petitioner which included the Georgia and Mississippi companies, and it was stated that the subsidiaries were consolidated with the petitioner for the purposes of the renegotiation agreement. Attached to the agreement was a list of the prime contracts of "R. G. LeTourneau, Inc., and Subsidiary, R. G. LeTourneau Co. of Georgia, and its Subsidiary, R. G. LeTourneau

Co. of Mississippi." There was also attached a separate list of subcontracts of "R. G. LeTourneau, Inc., and Subsidiaries." The agreement provided that "[t]he finding herein shall be deemed a final determination of the excessive profits * * * subject to the right of the Under Secretary of War, * * * to reopen the renegotiation in his discretion * * * upon a showing of fraud or malfeasance or a wilful misrepresentation of a material fact."

On June 18, 1943, the petitioner and the United States entered into a supplemental agreement concerning excessive profits for the year 1942. The parties agreed therein that the renegotiation agreement of April 23, 1943, covered two of the petitioner's subsidiaries, namely, the Georgia company and the Mississippi company, but that it contained no findings as to the profits of the subsidiaries. It was agreed that the disclosure of the amount of excessive profits and cash refund applicable to each company "is necessary and proper for tax and other purposes." Accordingly, the parties agreed that, as set out in a schedule attached to the agreement, the excessive profits of $4,700,000 previously agreed upon should be divided between the petitioner and the Georgia company by allocating $4,476,997.51 to the petitioner and $223,002.49 to the Georgia company. It was further agreed that the Mississippi company had no net earnings for 1942 and that no part of the excessive profits for that year should be allocated to it. The division between the petitioner and the Georgia company was based on a mathematical formula that is set out as part of the agreement.

By agreements dated December 1, 1944, and March 26, 1945, between the petitioner and the United States it was agreed that $3,900,000 of the profits realized by the petitioner in the calendar year 1943 and $5,100,000 of the profits of the petitioner for the calendar year 1944 from contracts and subcontracts subject to renegotiation should be eliminated. The petitioner was referred to in the agreements as "the Contractor." Each agreement provided in part:

Exhibit B annexed hereto and made a part hereof contains a complete list, as represented by the Contractor, of its subsidiaries, all of which are consolidated with the Contractor for the purposes hereof, except such, if any, as may be expressly excluded from such consolidation as indicated by proper notation on said Exhibit B. Also noted on Exhibit B is the part, if any, of the profits to be eliminated which is allocated to each subsidiary so consolidated with the Contractor. The part unallocated to subsidiaries is allocated to the Contractor. * * *

The corporations listed in exhibit B which was attached to each agreement are the Georgia company and the Mississippi company and it was stated in the exhibit that none of the excessive profits were to be allocated to either of those companies. Exhibit B attached to each agreement was signed by each of those companies by R. G.

LeTourneau as president of each. Each agreement contained the following provisions:

9. * * * This agreement shall be final and conclusive * * * and, except upon a showing of fraud or malfeasance or a willful misrepresentation of a material fact, * * * shall not for the purposes of the Renegotiation Act be reopened as to the matters agreed upon, * * *

10. *Renegotiation Rebate.* Nothing contained in this agreement shall prejudice any right which the Contractor may have to recover a renegotiation rebate pursuant to subsection (a) (4) (D) of the Renegotiation Act.

Excessive profits which were determined under each of the above renegotiation agreements were paid in full by the petitioner.

### *Rebate Claims.*

On July 18, 1947, the petitioner filed with the War Contracts Price Adjustment Board claims for net renegotiation rebates under the provisions of section 403 (a) (4) (D) of the Renegotiation Act of 1943 for the years ended December 31, 1943 and 1944, based upon claimed gross renegotiation rebates in the respective amounts of $313,702.31 and $589,184.55. On the same date the Georgia company filed with that Board a claim for a net renegotiation rebate for the year ended December 31, 1942, based upon a claimed gross renegotiation rebate in the amount of $41,721.19.

The Administrator of General Services determined gross renegotiation rebates in amounts less than claimed and determined net renegotiation rebates for the years 1942, 1943, and 1944 in the amounts of $2,163.21, $87,717.10, and $167,421.69, respectively. Notices of such rebates were mailed to the petitioner and to the Georgia company at the former address of the petitioner in Peoria, Illinois, on August 4, 1953. The details of the Administrator's computation of the amounts of the net renegotiation rebates are as follows:

| | Georgia company | Petitioner | | |
|---|---|---|---|---|
| | 1942 | 1942 | 1943 | 1944 |
| Recomputed amortization as certified by internal revenue agent in charge | $441,646.11 | $316,921.87 | $555,841.56 | $780,516.18 |
| Normal amortization included in costs for purposes of renegotiation | $436,669.08 | $319,575.74 | $387,143.63 | $466,639.73 |
| Additional amortization | $4,977.03 | | $168,697.93 | $313,876.45 |
| Excess or normal amortization over recomputed amortization certified | | ($2,653.87) | | |
| Excess amortization transferred to first subsequent year | | $2,653.87 | $2,653.87 | |
| Additional amortization used as basis for renegotiation rebate | | | $166,044.06 | $313,876.45 |
| Allocable percentage determined from renegotiation files | 1 72.44 | 1 72.44 | 1 88.046 | 1 88.90 |
| Gross renegotiation rebates | $3,605.36 | | $146,195.15 | $279,036.16 |
| Federal tax benefits | $1,442.15 | | $58,478.05 | $111,614.47 |
| Net renegotiation rebates | $2,163.21 | | $87,717.10 | $167,421.69 |

1 Per cent.

In explanation of the partial disallowance of the claims for rebates the Administrator advised the petitioner as follows:

The 1942, 1943 and 1944 claims of R. G. LeTourneau, Inc. are each based in part upon amortization allowed with respect to subsidiaries of the contractor. None of the excessive profits determined in the 1943 and 1944 renegotiations was allocated to the subsidiaries. To the extent that the 1942, 1943 and 1944 claims are based on amortization of the subsidiaries, such claims must be denied.

The amounts of the net renegotiation rebates as determined by the Administrator of General Services were duly paid to the petitioner by United States Treasury checks.

In April 1948 the petitioner purchased from the Georgia company all of the capital stock of the Mississippi company for $50,000. The Georgia company also sold to the Mississippi company all the machinery, tools, equipment, and other assets which it owned at the Vicksburg plant at its book value less certain obligations assumed by the Mississippi company. The Mississippi company gave its demand note to the Georgia company in payment for such assets.

As of December 31, 1950, the Georgia and Mississippi companies were dissolved and the petitioner as sole stockholder of both corporations acquired all of their assets, assumed their existing liabilities, and succeeded to all of their rights. The parties have stipulated that if there is any additional renegotiation rebate due to the Georgia company, the petitioner is entitled to receive such rebate.

### OPINION.

The petitioner and its subsidiary, the Georgia company, had contracts which were subject to renegotiation. The Mississippi company, a subsidiary of the Georgia company, had no such contracts. Renegotiation proceedings were conducted on a consolidated basis in which the existence of the subsidiaries was recognized, but all of the excessive profits were determined to be allocable to the petitioner except a portion to the Georgia company for the year 1942. The petitioner repaid to the United States the full amount of the determined excessive profits. Thereafter claims for net renegotiation rebates under section 403 (a) (4) (D) of the Renegotiation Act of 1943 [1] were filed by the Georgia company for the year 1942 and by

---

[1] The applicable statute is commonly referred to as the Renegotiation Act of 1943 and is so designated by the parties. The sections pertinent to this proceeding were enacted in section 701 of the Revenue Act of 1943 as an amendment to section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942. Section 403 (a) (4) (D) provides as follows:

(D) Notwithstanding any of the provisions of subsection (c) (4) of this section to the contrary, in the case of a renegotiation which is made prior to such recomputation, there shall be repaid by the United States (without interest) to the contractor or subcontractor after such recomputation the amount of a net renegotiation rebate computed in the follow-

the petitioner for the years 1943 and 1944. These claims were allowed in part by the respondent and rebates were paid. The issue here is the correctness of the respondent's action in disallowing a portion of the claimed rebates. As respects the claim of the Georgia company the petitioner is before us as successor in interest of that company.

The petitioner and the Georgia and Mississippi companies each held certificates of necessity covering emergency facilities and claimed amortization deductions with respect thereto in their Federal income and declared value excess-profits tax returns for the years 1942, 1943, and 1944 based on a period of 60 months as permitted by section 124 (a), I. R. C. 1939.

Section 124 (d) of the Code provided that, if the President proclaimed the ending of the emergency period on a date that occurred within the 60-month amortization period, then the taxpayer might elect to terminate the amortization period as of the end of the month in which the proclamation was issued. By Presidential proclamation No. 2669, dated September 29, 1945, the President declared the emergency ended as of that date. 10 Fed. Reg. 12475 (1945). The petitioner and the subsidiaries elected to terminate the amortization period with respect to all of their emergency facilities as of September 30, 1945. That date was within the 60-month period and the election so made had the effect of increasing the amounts of the allowable deductions for amortization.

Each of the above claims for net renegotiation rebates for the years 1942, 1943, and 1944 was based in part upon the claimed right to take into consideration, in computing the gross renegotiation rebate, the accelerated amortization allowable for tax purposes with respect to

ing described manner. There shall first be ascertained the portion of the excessive profits determined by the renegotiation which is attributable to the fiscal year with respect to which a net renegotiation rebate is claimed by the contractor or subcontractor (hereinafter referred to as "renegotiated year"). There shall then be ascertained the amount of the gross renegotiation rebate for the renegotiated year, which amount shall be an allocable part of the additional amortization deduction which is allowed for the renegotiated year upon the recomputation made pursuant to section 124 (d) of the Internal Revenue Code in connection with the determination of the taxes for such year and which is attributable to contracts with the Departments and subcontracts, except that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation. The allocation of the additional amortization deduction attributable to contracts with the Departments and subcontracts, and the allocation of the additional amortization deduction to the renegotiated year shall be determined in accordance with regulations prescribed by the Board. There shall then be ascertained the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for the renegotiated year. Such Federal tax benefit shall be the amount by which the taxes for the renegotiated year under Chapters 1, 2A, 2B, 2D, and 2E of the Internal Revenue Code were decreased by reason of omitting from gross income (or by reason of the application of the provisions of section 3806 (a) of the Internal Revenue Code with respect to) that portion of the excessive profits for the renegotiated year which is equal to the amount of the gross renegotiation rebate. The amount by which the gross renegotiation rebate for the renegotiated year exceeds the amount of the contractor's or subcontractor's Federal tax benefit from the renegotiation for such year shall be the amount of the net renegotiation rebate for such year.

emergency facilities of subsidiaries to which, in the renegotiation agreements, no excessive profits had been allocated (aside from the profits of the Georgia company on certain munitions contracts). The respondent, pursuant to the renegotiation regulations,[2] disallowed the claims to the extent they were so based upon accelerated amortization of facilities of the subsidiaries, on the ground that no excessive profits, with the exception noted above, had been allocated to the subsidiaries in the renegotiation agreements.

Section 403 (a) (4) (B) of the Renegotiation Act of 1943, and the corresponding section of the Renegotiation Act of 1942, provided in general that in computing the profits derived from renegotiable contracts there should be allowed as a part of cost the deductions and exclusions allowed by chapters 1 and 2E of the Internal Revenue Code which are properly allocable to renegotiable contracts. This would include deductions for amortization of emergency facilities. However, section 403 (a) (4) (C) provided that no amounts should be allowed as an item of cost by reason of a recomputation of the amortization deduction under section 124 (d) of the Internal Revenue Code until such recomputation had been made in connection with the determination of the Federal tax liability. Subparagraph (C) further provided that the absence of a recomputation of amortization deductions for tax purposes should not be cause for postponing the determination of excessive profits or for staying the elimination thereof.

Section 403 (a) (4) (D), set forth in footnote 1, provided that in the case of a renegotiation which had been made prior to recomputation of the accelerated amortization deduction provided for tax purposes by section 124 (d), the United States should repay "to the contractor or subcontractor after such recomputation the amount of a net renegotiation rebate." The amount of the net renegotiation rebate, briefly, was the amount by which the "gross renegotiation rebate" exceeded the contractor's tax benefit from the renegotiation. The amount of the "gross renegotiation rebate" was defined as the additional amortization deduction allowed for the particular year upon the recomputation made under section 124 (d) for tax purposes, with the following exception:

---

[2] Renegotiation Regulation 383.3 (4) (a), as stipulated by the parties, provides in part. as follows:

(a) *Allocation of Excessive Profits.* Subsection (a) (4) (D) of the 1943 Act provides that the gross renegotiation rebate shall not exceed the excessive profits determined and eliminated for the fiscal year for which the claim for renegotiation rebate has been made. In the absence of such circumstances as would afford a basis for setting aside the determination of excessive profits, the allocation of excessive profits (i) to a fiscal year or (ii) between contractors if renegotiation was conducted on a consolidated basis, made in the order or agreement determining such excessive profits, will be conclusive in determining the amount of the gross renegotiation rebate. * * *

except that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation. * * *

The purpose and effect of these statutory renegotiation rebate provisions is succinctly stated in Renegotiation Regulation 383.3 (1), as stipulated by the parties, as follows:

(1) *General.* A contractor who has eliminated excessive profits determined under the Renegotiation Act will be entitled to a net renegotiation rebate under subsection (a) (4) (D) of the 1943 Act with respect to each fiscal year for which such excessive profits were eliminated if, on a recomputation of the amortization deduction under section 124 (d) of the Internal Revenue Code made in connection with the determination of the contractor's taxes for such fiscal year, there is an additional amortization deduction for such fiscal year all or some part of which is determined, in accordance with the regulations hereinafter prescribed, to be attributable to contracts with the Departments and subcontracts. Such net renegotiation rebate is intended to restore to the contractor the excessive profits determined and eliminated for such fiscal year in an amount equal to that part of such additional amortization deduction for such year attributable to contracts with the Departments and subcontracts, but only to the extent that such additional amortization deduction would have resulted in a reduction in the amount of excessive profits eliminated, less the Federal tax benefit thereon as defined by subsection (a) (4) (D) of the Renegotiation Act. * * *

The petitioner states that if the amount of the additional amortization for the petitioner and the subsidiaries had been known at the time of the original renegotiations for the years in question, the full amount of such amortization for all three companies would have been allowed as an item of cost, and contends that there is no logical or just reason for refusing to allow the same item through the procedure of a renegotiation rebate after it has been ascertained, provided that the total amount of rebate does not exceed the total amount of excessive profits eliminated for the consolidated group. It is its contention that the limitation imposed by section 403 (a) (4) (D) that the amount of the gross renegotiation rebate should not exceed the amount of excessive profits eliminated, refers to excessive profits for the consolidated group and not to excessive profits of individual companies in the group. It further contends specifically that the subsidiaries were merely its agencies or instrumentalities; that the separate identity of the three corporations should be ignored and that they should be treated, for the purpose of determining the gross renegotiation rebates, as one corporation, to wit, R. G. LeTourneau, Inc., with three divisions or plants; and that the single corporation is entitled to include in the single gross renegotiation rebates accelerated amortization of all emergency facilities whether owned by the parent or the subsidiaries and whether used in connection with or attributable to earthmoving equipment manufacturing, or shell

manufacturing. Under this view the petitioner alone would be considered as "the contractor or subcontractor" within the meaning of section 403 (a) (4) (D), as to all contracts whether executed by itself or by the Georgia company.

The respondent contends that the separate entities may not be ignored. He states that under the Mississippi company's method of operation, that is, at cost, that company had no excessive profits in any of the 3 years before us; that as to the Georgia company a rebate has been allowed as to profits on its prime shell contracts and that there were no profits on the earthmoving equipment which it manufactured for the petitioner at cost; and that as to the years 1943 and 1944 it was agreed in the renegotiation proceedings that *all* excessive profits were realized by the petitioner and that *none* were realized by the Georgia and Mississippi companies. It is therefore his position that renegotiation rebates, in addition to those already allowed to the Georgia company, based upon additional amortization deductions on account of facilities owned by those companies is prohibited by the provisions of section 403 (a) (4) (D).

The petitioner, in support of its contention that the separate indentity of itself and the two subsidiaries should be ignored, cites a number of cases, including *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, and *Munson S. S. Line* v. *Commissioner*, 77 F. 2d 849, and we have given careful consideration to the authorities cited. The general rule is now well established that effect must be given to the existence of a corporation apart from its shareholders whether the stock be held by one or more shareholders and regardless of whether held by an individual, an estate, or another corporation, provided the corporation is not a sham or unreal but carries on business activities. *National Carbide Corporation* v. *Commissioner*, 336 U. S. 422; *Burnet* v. *Commonwealth Improvement Co.*, 287 U. S. 415; *Moline Properties* v. *Commissioner*, 319 U. S. 436; *Klein* v. *Board of Supervisors*, 282 U. S. 19, 24. See also *Higgins* v. *Smith*, 308 U. S. 473; *National Investors Corporation* v. *Hoey*, (C. A. 2) 144 F. 2d 466; *Paymer* v. *Commissioner*, (C. A. 2) 150 F. 2d 334; and *Howard A. Jackson*, 24 T. C. 1, affd. (C. A. 2) 233 F. 2d 289. In the *Moline Properties* case the Court said in part (319 U. S. at p. 438):

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * *

In *National Carbide Corporation* v. *Commissioner, supra*, which, like the instant case, involved a situation where there was complete

domination of subsidiaries by the parent corporation, the Supreme Court stated, in part (336 U. S. at p. 428–429) :

"Agency" and "practical identity," as those words are used in the *Southern Pacific* case, are unquestionably opposite sides of the same coin. The close relationship between corporations because of complete ownership and control of one by the other was the basis for the result reached, whatever its articulation. That basis has been repudiated by subsequent decisions of this Court. * * *

Under the general principle established by the cases, the facts in the instant case require recognition of the petitioner and the subsidiaries as separate entities. There were substantial reasons for the incorporation of each of the companies. Each of the corporations conducted business activities; each treated itself, as well as the other two, as having a separate existence in essential respects; and each filed Federal income and declared value excess-profits tax returns wherein it reported income and deductions. The petitioner and the Georgia company each entered into separate contracts with the United States for the production of war materials. There is in the record a considerable volume of testimony as to the practical control exercised by R. G. LeTourneau over the operations of the three corporations, which leaves no doubt that he was the dominant figure in the operations of all three. However, that fact, as shown by the above cases, does not furnish any reason for disregarding separate entities.

In relying upon *Munson S. S. Line* v. *Commissioner*, *supra*, the petitioner in effect asks that we recognize an exception to the general rule above enunciated. The Supreme Court has clearly indicated that the principle of the *Munson* case is to be strictly confined. In the *National Carbide* case the Supreme Court noted that the *Munson* case had been explained in the *Moline Properties* case as depending upon a particular legislative purpose which justified disregarding the separate entity. The legislative purpose referred to was the development of the merchant marine. The legislative purpose of the rebate provisions of the Renegotiation Act with which we are concerned was to allow a renegotiation rebate to a particular contractor against whom excessive profits were determined in a prior renegotiation, and the gross renegotiation rebate may not exceed the excessive profits so determined. In the instant case there were two contractors, the petitioner and the Georgia company, and excessive profits were determined in prior renegotiations against each of them. To carry out the plain statutory directive, we think it is necessary to continue to recognize the separate entities for rebate purposes.

The fact that the petitioner and the subsidiaries were all included as parties in consolidated renegotiations is not ground for ignoring the separate existence of each corporation in the determination of the proper amounts of the renegotiation rebates. The record does not

contain any detailed evidence as to the manner of renegotiating on a consolidated basis. It has not been shown that in such a renegotiation the various entities are treated as one or that amortization of facilities of one entity is used to offset profits of another. Indeed, the renegotiation regulations dealing with consolidated renegotiation,[3] rather than requiring the disregard of the separate identity of the members of the group, distinctly recognize their separate existence and specifically require that the excessive profits be allocated among them. And in the later regulations,[4] dealing with renegotiations on a consolidated basis after the President's proclamation of September 29, 1945, it is clearly stated that there may be applied in reduction of excessive profits of any contractor only the additional amortization applicable to such contractor, and not any such amortization applicable to any other contractor in the group. In the renegotiation agreement for 1942 the amount of excessive profits allocable to the Georgia company was fixed. In the agreements for the years 1943 and 1944 the subsidiaries agreed that none of the ex-

---

[3] Renegotiation Regulations 309 and 311, 9 Fed. Reg. 6160 (1944), provide as follows:

Sec. 1603.309 *Renegotiation of parent and subsidiaries on consolidated basis*—(a) *When authorized.* Renegotiation of parent and subsidiary companies may, in the discretion of the Department conducting the renegotiation, be conducted on a consolidated basis whether or not the parent and subsidiaries constitute an "affiliated group" as defined in subsection (d) of section 141 of the Internal Revenue Code.

\* \* \* \* \* \* \*

Sec. 1603.311 *Allocation of excessive profits in cases of consolidated renegotiation.* (a) In renegotiation on a consolidated basis, careful scrutiny will be given to the methods employed in segregating costs as well as income as between the corporations or enterprises included in the consolidated renegotiation, particularly where the type of business conducted by one is different and distinct from the type of business conducted by the others in the consolidated group.

(b) Excessive profits must be allocated among the corporations or enterprises included in the renegotiation, and the renegotiation agreement must disclose the allocation. If excessive profits have been realized and the renegotiation agreement merely imposes liability generally on the entire consolidated group for the profits found to be excessive, without fixing the separate liability, then the members of the group may not be allowed a deduction from their income for Federal tax purposes for the amount of excessive profits to be eliminated under the agreement or a tax credit under section 3806 of the Internal Revenue Code. The excessive profits must be so allocated even though some or all of the members of the consolidated group participate in filing a consolidated Federal tax return.

\* \* \* \* \* \* \*

(d) To make such allocations of the excessive profits, a review of the unconsolidated financial statements of each member of the group must be made, and the record must show a proper basis for the allocation.

[4] Renegotiation Regulation 383.2 (3) (c), as stipulated by the parties, provides in part:

(c) Since this procedure is designed to permit the contractor to offset against excessive profits to be eliminated for the fiscal year involved in the renegotiation the additional amortization allowance in anticipation of his renegotiation rebate for such fiscal year, it is not available to any contractor who would not otherwise be entitled to a renegotiation rebate under subsection (a) (4) (D) of the Renegotiation Act for such year. Thus, in the case of renegotiations conducted on a consolidated basis there may be applied in reduction of the excessive profits to be eliminated by any contractor or subcontractor in the consolidated group only the additional amortization allowance applicable to such contractor or subcontractor for such year, and any additional amortization to which any other contractor or subcontractor in the group may ultimately be entitled under the Internal Revenue Code may not be so applied. \* \* \*

cessive profits were to be allocated to them. Each agreement provided that it was final and conclusive and not to be reopened except "upon a showing of fraud or malfeasance or a wilful misrepresentation of a material fact."

In view of the foregoing we conclude that the separate identity of the petitioner and the other two corporations must be recognized in these rebate proceedings. Section 403 (a) (4) (D), in providing for the payment of a renegotiation rebate "to the contractor or subcontractor after such recomputation," obviously has reference to the contractor or subcontractor which had emergency facilities which were subject to accelerated amortization deductions. We find nothing in the Renegotiation Act of 1943 that would lead to the belief that any contractor is entitled to receive a renegotiation rebate on the basis of accelerated amortization deductions with respect to facilities owned by another entity, even though such other entity was a subsidiary and had been included in consolidated renegotiations. It follows that in computing the gross renegotiation rebates to which the Georgia company is entitled for the year 1942 and to which the petitioner is entitled for the years 1943 and 1944, each of those companies is permitted to include only the accelerated amortization upon the facilities which it owned.

The accelerated amortization attributable to the facilities of the subsidiaries would properly be taken into account in computing any gross renegotiation rebate to which they might be entitled. No claim is made that the Mississippi company is entitled to a rebate (in fact it had no renegotiable contracts), and the Georgia company has received a net renegotiation rebate for 1942 based upon its facilities which contributed to its excessive profits for that year which were eliminated in the renegotiation. In the renegotiation agreements it was agreed that no other profits were allocable to either of the subsidiaries. In addition, the evidence shows that in fact they had no other profits, since billings to the parents were at cost. Accordingly, in no event would either subsidiary be entitled to any rebate (in addition to that already allowed to the Georgia company) in view of the plain provision of section 403 (a) (4) (D) of the Renegotiation Act "that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation."

The petitioner contends that Renegotiation Regulation 383.3 (4) (a) (ii), set forth in footnote 2, upon which the respondent relies, goes beyond the authority conferred by the Renegotiation Act. We think not, in view of section 403 (a) (4) (D) of the Act, which provides that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated for the renegotiated year pursuant to the renegotiation, and section 403 (c) (4) of each

754

of the Renegotiation Acts of 1942 and 1943 which provides for the making of renegotiation agreements, and further provides that as to matters agreed upon they shall be conclusive and shall not be reopened in the absence of a showing of "fraud or malfeasance or a wilful misrepresentation of a material fact." Neither party claims that there are any such grounds for a reopening of the renegotiation proceedings.

In its brief the petitioner asks for findings of fact based on a letter from the War Department dated January 31, 1947, addressed to the petitioner. It appears that such letter represents only a suggested procedure and it does not appear that the petitioner ever pursued the matter further. We find therein nothing which is material to a decision of the issue presented to us.

In view of the foregoing, and upon the basis of the provisions of the Renegotiation Act of 1943, particularly that portion of section 403 (a) (4) (D) which provides that the amount of the gross renegotiation rebate shall not exceed the amount of excessive profits eliminated by renegotiation, it is our conclusion that the petitioner is not entitled to recover net renegotiation rebates for the years 1942, 1943, and 1944 in excess of the amounts determined and paid by the respondent.

*Decision will be entered for the respondent.*

