**AIRCO, INC.**

v.

**The UNITED STATES.**

**No. 221–75.**

United States Court of Claims.

June 15, 1977.

William E. Flowers, attorney of record for plaintiff. Shearman & Sterling, New York City, of counsel.

Howard G. Slavit, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant. Robert N. Dorosin, Washington, D.C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, JJ.

ON PLAINTIFF'S MOTION AND
DEFENDANT'S CROSS–MOTION
FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case is before the court on cross-motions for summary judgment. The issue is

unique among our cases, but a relevant Tax Court precedent will be referred to. It relates to a juridical animal long since extinct, the net renegotiation rebate. The General Services Administration (GSA) in a 1975 decision disallowed all but minor parts of claims by plaintiff for such rebates, that had been on file since 1952. The delay is partly attributed to awaiting the Tax Court precedent referred to, but *LeTourneau Inc. v. Administrator of General Services*, 29 T.C. 737, was filed January 30, 1958. The defendant gets the benefit of the delay, as there is no interest allowable, still less any allowance for inflation.

Many contractors in World War II renegotiation included in their allowable costs amortization of emergency facilities that had been constructed under certificates of necessity. These certificates, awarded by the defense production authorities, by § 124 of the Internal Revenue Code of 1939, entitled the owner to amortize over sixty months; however, to still the fear that he might be stranded by the end of the war with emergency facilities still partly unamortized, there was also a provision in § 124(d) for shortening the period by proclamation of the President, thereby generating a recomputation and reduction of taxes. The Renegotiation Act provided in 50 U.S.C. App. § 1191(a)(4)(C), that no such addition should be made to allowable costs in renegotiation until the additional tax deduction had been determined, but the absence of such a recomputation should not constitute a cause for postponing the elimination of excessive profits by agreement or order. The renegotiation rebate was then provided for in the following § (a)(4)(D) and it was to be available notwithstanding the finality provisions of § (c)(4). Section (a)(4)(D) went on to tell how it was to be computed. First a gross renegotiation rebate was computed by allocating an appropriate part of the entire § 124(d) additional tax deduction. Then the final or net rebate was computed by taking off the part of the gross rebate that equalled the tax benefit from the elimination of the excessive profits in renegotiation, so far as it was to be restored via the rebate. This is an oversim-

plified version but will do for the instant case which does not involve the computation method as such. A rebate claimant had to file a timely claim. This was by amended statute, with the Administrator of General Services, 50 U.S.C. App. § 1231 by the time our plaintiff's claim was ready.

It was apparently, in Congressional eyes, a matter of simple arithmetic based on the documents in each case; the § 124(d) determinations of the IRS and the determinations of the War Contracts Price Adjustment Board (WCPAB) respecting excessive profits, the latter being final except as it did not block the computation of the rebate.

The problem in the instant case owes its existence largely to the tax controversy between the plaintiff Airco and the Internal Revenue Service that raged in the World War II period, and its resolution by the Supreme Court in *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949) (National Carbide being one of Airco's subsidiaries). Airco in and after 1938, the tax year under review in that case, did its business largely through wholly owned subsidiaries which it utilized as operating companies. Contracts between the parent and each subsidiary provided in substance that the latter was employed as agent to manage and operate plants designed for the production of products assigned to each, and as agents to sell the output of the plants. Airco furnished working capital, management, and office facilities. Subsidiaries paid Airco all their profits in excess of 6 percent on a nominal outstanding capital stock. They held title to the assets they used (and also the certificates of necessity for their emergency facilities were issued to them), and amounts advanced by Airco for purchase of assets and working capital were shown on the subsidiaries' books as accounts payable to Airco. No interest ran on these accounts. Airco treated all profits thus turned over to it as its own income for Federal tax purposes. Subsidiaries reported as income only the 6 percent return above-mentioned, and used their nominal outstanding stock only to compute the "declared value excess prof-

its tax." The Commissioner claimed, and the Supreme Court held, affirming the Second Circuit, that the subsidiaries were taxable on the income turned over to Airco. It is not necessary to discuss the issues in detail: suffice it that Airco had sought to take advantage of a line of cases evidencing a willingness to pierce the corporate veil for tax purposes; and treat parent-subsidiary groups as unities. The decision signalled a return to strict adherence to corporate identities, with exceptions, if any, not here pertinent. The subsidiaries were deemed to have attempted to avoid taxation by anticipatory assignment of their income. A vital thing here is the timing. Airco's 1942, 1943, and 1944 renegotiations were conducted with reference to Airco's chosen way of reporting for tax purposes, and the drastic change imposed by the Second Circuit and the Supreme Court took effect only after the renegotiations for those years became final by agreement.

The renegotiation agreement for the year ended December 31, 1942, was dated June 14, 1944, and eliminated by refund $2,300,000 of excessive profits after consolidated renegotiation of Airco and 15 named subsidiaries, but recited that no part of the profits to be eliminated were allocated to the subsidiaries.

The renegotiation agreement for the year ended December 31, 1943, was dated August 30, 1945, and eliminated $2,586,594 of excessive profits after consolidated renegotiation of Airco and 15 named subsidiaries, but recited that no part of the profits to be eliminated were allocated to the subsidiaries.

The renegotiation agreement for the year ended December 31, 1944, was dated the _____ day of January 1946, and eliminated $905,984 of excessive profits after consolidated renegotiation of Airco and 16 named subsidiaries, but recited that no part of the profits to be eliminated were allocated to the subsidiaries.

There is no reference in any of the agreements to "accelerated" or § 124(d) additional amortization, and presumably none was allowed, the right to a renegotiation rebate

being saved instead. It will be seen that all the profits were allocated to the parent and all the amortization to the subsidiaries. Nevertheless, there is no reason to doubt, and the parties assume that the benefit of the certificates of necessity issued to the subsidiaries, and resultant 60-month amortization, was conferred on the parent in view of the fact that the financial data used was consolidated. The subsidiaries, however, were not formally parties to the agreements.

This sets up the first and largest issue between the parties here. Plaintiff asserts that in computation of the statutory renegotiation rebates, the plaintiff should receive the benefit of certificates of necessity issued to subsidiaries, because it received in consolidated renegotiation the benefit of the amortization attributable to them, other than the "accelerated" § 124(d) portion. In a consolidated renegotiation, the § 124 amortization was always thrown into the cost pot the same as any other cost. The purpose of the rebate calculation, according to plaintiff, is to reconstruct the benefit the plaintiff would have received if the termination date (September 29, 1945) shortening the amortization period had been known and taken into account in the original renegotiation. In general, this is true. *See* WCPAB Renegotiation Reg. (RR) 383.-3(4)(c)(ii). But not always, says defendant. It says that no rebate can be computed on account of certificates of necessity issued to the subsidiaries, because no part of the excessive profits refunded were realized by them, according to agreements now final by their own terms and by statute. Airco's alternative argument is, if the rebates cannot be computed on a consolidated basis, then the excessive profits should be reallocated to the subsidiaries consistent with the *National Carbide Corp.* decision, *supra*. It is of course perfectly obvious if that decision had preceded, instead of following, the involved renegotiation agreements, the excessive profits would have been allocated wholly or in major part to the subsidiaries. But, says defendant, the agreements are final and cannot now be altered.

Plaintiff is wrong in assuming that the accelerated or § 124(d) amortization was simply an amplification or correction of the original 60-month amortization. The statutory language of § 1191(a)(4)(C) shows that Congress treated it as a different animal, subject to different laws of life. For instance, it could not be estimated, but had to be determined by the IRS before the WCPAB could adjust for it, and no estimate could be allowed as a cost. The WCPAB had many renegotiations still open on September 29, 1945, but it did not, as it could not, simply enlarge the cost allowances for accelerated amortization. Instead, it promulgated an amendment to the regulations, § 382.2(3) entitled *Anticipation of Renegotiation Rebate*. It provided that in case a rebate was anticipated, no change could be made in the costs. The rebate estimate would be taken tentatively off the excessive profits determination. And what is most pertinent, and indeed, almost conclusive here, it provided expressly that in case of a consolidated renegotiation the additional allowance could be applied only against the profits to be eliminated by the contractor to which the additional allowance belonged, not any other contractor in the group. This subsection is copied in Ex. A attached hereto. Thus, if plaintiff's renegotiations for 1942, 1943, and 1944, had been still open on September 29, 1945, the plaintiff could not have obtained from the Board the application of accelerated amortization for the subsidiaries' emergency facilities, to the parent's excessive profits, such as it is seeking here.

In case of consolidated renegotiation, the allocation of the excessive profits determination to or among the individual entities was mandated by § 311 of the Regulations, it being explained as necessary for calculation of tax credits, but it was required even when the group reported for tax purposes on a consolidated basis.

We further note that the date of the agreement for 1944 was after the termination date of September 29, 1945, though we allude to it above as prior. We would deem it reasonable to suppose that plaintiff and the Board may have negotiated it out before that date and preferred not to reopen renegotiations; however, plaintiff might have known that to reopen would have been futile so far as obtaining an allowance for anticipation of a renegotiation rebate was concerned.

In any event, plaintiff is asking us for something it could not have obtained from the Board had the cases been open, and that in face of the finality provisions that would not have been a difficulty in the case of open renegotiations.

Defendant cites the *LeTourneau Inc.* case, *supra*, as in strong support of its position, and it does appear to provide such support. Just as here, the contractor, after a consolidated renegotiation, sought a renegotiation rebate for emergency facilities owned by a subsidiary to which no excessive profits had been allocated. The Tax Court held that this could not be done. Plaintiff, however, relies on a statement, 29 T.C. at 752, that it had "not been shown that in such a renegotiation the various entities are treated as one or that amortization of facilities of one entity is used to offset profits of another." We hardly think the learned judge would have been kept long in ignorance of the facts if there had been any hope of changing his mind with them. Nor do we entertain any doubt but that, in any consolidated World War II renegotiation, settled by agreement, such offsets were available, so far as concerned the 60-month amortization. The whole trend of the opinion shows that the use of the original amortization as a cost that, in consolidated renegotiation, offsets profits of other entities, is an irrelevant fact respecting the treatment of that peculiar animal, the renegotiation rebate. The remark plaintiff relies on is an unfortunate digression, not a vital part of the decision.

It is of some if slight significance to note that the *LeTourneau* case was back in the Tax Court on a remand by the D.C. Circuit, 96 U.S.App.D.C. 326, 226 F.2d 48 (1955). The lower court had initially held that the renegotiation rebate was not subject to its jurisdiction over renegotiation cases, 22 T.C.

490, but the circuit judge took the view that the determination of the rebate was an integral part of the renegotiation process.

■ Really we think the plaintiff's case on this issue is hopeless unless it can persuade this court to reform the 1942, 1943, and 1944 agreements to reallocate the excessive profits back to the subsidiaries that owned the emergency facilities. If the parties had anticipated the *National Carbide* decision, *supra*, that is where they no doubt would have allocated them in the first instance. Under 28 U.S.C. § 1491 (Supp. V. 1975), *as amended* by Pub.L. 92–415, we now have authority to correct records, as an incident to monetary relief, and we have always exercised power to reform contracts in connection with money claims, *Chernick v. United States*, 372 F.2d 492, 178 Ct.Cl. 498 (1967). Plaintiff also suggests a kind of collateral estoppel as an equitable ground. It would appear, however, to call on us for a brazen display of judicial activism to do this in face of the finality language both of the statute and of the contracts. Section 1191(c)(4) of the Act provides that an agreement shall be "final" and "conclusive according to its terms; and except upon a showing of fraud or malfeasance or a willful misrepresentation of a material fact, * * * *" may not be reopened. The contract language tracks the statute, but reopening is allowed for the renegotiation rebate. In *Alloy Products Corp. v. United States*, 302 F.2d 528, 157 Ct.Cl. 376 (1962), we expressed our respect for and obedience to the statutory language. That case did not involve a renegotiation rebate, however.

Assuming that the rebate determination was part of renegotiation, as the D.C. Circuit held in *LeTourneau, supra*, the Congress indicated in the strongest way that it wanted the agreements to be made final without awaiting the recomputation of the amortization deduction, and it wanted the excessive profits elimination not to be stayed. Section 1191(a)(4)(C). There was a war going on and the restoration of excessive profits to the Treasury was not to be delayed by the tax lawyer's or accountant's search for perfection. Nevertheless, correc-

tion of even flagrant errors of fact or law was not allowed for unless they were induced by fraud, etc., as specified. The use of a rebate claim as a camel's head to open up the tent and correct anything that might look like or even be error, was not consistent with the Congressional objectives. We think they could only be served by computing the rebate as a simple mathematical operation, taking everything previously agreed to as given (even though it might subsequently appear to be error) and refunding the net rebate as thus computed. The finality exception for renegotiation rebate computation was not meant as authority to reopen anything in the agreement that might influence the computation of the rebate. If it did, the exception would have swallowed up the rule.

Evidently, if the GSA had allocated the excessive profits to the subsidiaries, it would have had to make a refund determination as to each one. *Quaere* whether the sum of these determinations would have had to equal the total refund agreed to for the parent. It would appear the tax credits would have had to be recomputed.

We think if Congress had intended the renegotiation rebate determination to imply considerations of this kind it would have retained the function in the WCPAB as long as that body existed, and afterwards in the successor boards. With all respect to the talents of the GSA, it would not have made any sense to assign to it a function that would have included reopening WCPAB decisions when a successor board having the expertise to do it actually existed.

■ Accordingly, we hold that plaintiff is not entitled to have its renegotiation rebates computed on a consolidated basis, and thus obtain the benefit of certificates of necessity issued to subsidiaries which, by agreement, realized no excessive profits; nor is it entitled, in course of renegotiation rebate determinations, to have its renegotiation agreements reformed to allocate excessive profits to subsidiaries instead of the parent corporation.

On application of the foregoing reasoning, the remaining issues are readily decided.

Airco had in 1942, 1943, and 1944, two foreign subsidiaries, whose sales were counted in renegotiation among non-renegotiable and total sales. The percentages of renegotiable costs and sales for each year were agreed on an arbitrary formula because such sales were at lower tier subcontract levels where the statutory notices could not usually be counted on, and there was at that time no standard commercial article exemption. The foreign subsidiaries had no emergency facilities, and the domestic ones had them all, and therefore, in effect, the formula reduced the percentage of amortization of such facilities which was allocated to renegotiable business, below what it was in the subsidiaries that had such business. Plaintiff wants this error corrected in computation of the renegotiation rebates. A higher allocation would increase the gross renegotiation rebate proportionately.

The WCPAB said in RR § 383.3(4)(c)(iii) that in general when costs, including depreciation and (original) amortization have been allocated on the basis of the ratio of renegotiable and non-renegotiable sales to total sales, the § 124(d) or accelerated amortization shall be allocated the same way in calculating the renegotiation rebate. Any deviation must be clearly and factually explained, "and the burden of proof will be on the contractor to establish the validity of the basis so employed." Airco says it has met this standard.

■ Defendant relies on the finality language, *supra*, and on estoppel. We believe the former suffices. The Board unfortunately did not specify what would justify deviating from the general rule. We must try to reason as it would have. In this instance, the allocation of sales and costs, including original amortization, was negoti-ated out, as the agreements themselves make clear. The parties, knowledgeable on both sides, could not have overlooked that the agreed allocation could have its effect on the calculation of the rebates even though the extent of shortening of the periods was not yet known, and the regulation not yet promulgated. The regulation is only the expression of common sense. The arising of a right to shorten the amortization period was an eminently foreseeable event. Nothing has happened as to this issue that was a surprise such as the *National Carbide, supra*, decision. The negotiators must be presumed to have foreseen a shortening and traded off any disadvantage to the contractor arising from the allocation of costs to obtain other advantages. The finality language makes that presumption conclusive.

■ Next, plaintiff wants the rebates to be increased by adding the additional amortization for each year, to the previously allowed costs so far as allocable, and allowing a profit percentage on the new cost figures equal to the percentage allowed on the old ones under the agreements. The statute clearly does not provide for this. It precludes treating the accelerated amortization as a cost, and it would violate the statute to compute the renegotiation rebate in this fashion.

There also was an issue whether the tax calculations for the net renegotiation rebates should take into account post war refunds of 10 percent of the excess profits taxes. Defendant now concedes that this adjustment should be made, and the judgment will reflect that it has been made.

The parties during and since oral argument have communicated the following figures as the gross renegotiation rebates, Federal tax benefits, and net renegotiation rebates, on the hypothesis, which the above shows to be correct, that the court accepts defendant's view of the case:

| FY | Gross Rebates | Tax Benefits | Net Rebates |
|----|---------------|--------------|-------------|
| 1942 | $ 9,661.76 | $ 7,826.03 | $1,835.73 |
| 1943 | 20,215.13 | 16,374.76 | 3,840.37 |
| 1944 | 66,759.58 | 57,079.44 | 9,680.14 |

Accordingly, the court dismisses the petition so far as it claims in excess of the above figures, but finds and determines that the gross renegotiation rebates, tax benefits, and net renegotiation rebates, respecting the plaintiff's 1942, 1943, and 1944 renegotiations, are as stated in the above columns. The cross-motions for summary judgment are each granted in part and denied in part. Judgment is entered for the plaintiff in an amount equalling the sum of the figures in said right-hand column, defendant having made no claim of payment. No interest is awarded.

## EXHIBIT A

Excerpt from Renegotiation Regulations of War Contracts Price Adjustment Board under Renegotiation Act of 1943.

(3) *Anticipation of Renegotiation Rebate.*

(a) If by reason of the issuance of a Certificate of Non-Necessity or the President's proclamation of September 29, 1945, a contractor elects to terminate the amortization period with respect to any facility in accordance with section 124(d) of the Internal Revenue Code and if it appears that, upon a recomputation of the amortization deduction for the taxable year involved in the renegotiation made in connection with a determination of the contractor's Federal taxes for such year the contractor would be entitled to a renegotiation rebate for such year pursuant to subsection (a)(4)(D) of the Renegotiation Act, there may be accorded to the contractor the privilege of anticipating the renegotiation rebate in the manner described in the succeeding subdivisions of this paragraph.

(b) There will be allowed as an item of cost in the determination of the excessive profits, if any, of the contractor in such renegotiation only the properly allocable portion of amortization at the rate of 1⅔ per cent per month. The amount, if any, of excessive profits to be eliminated shall, however, but only if determined by agreement, be fixed after applying in reduction thereof the allocable portion of the excess of the estimated amortization computed on the basis of the contractor's shortened amortization period of less than 60 months over the amount of amortization allowed as a cost as provided in the preceding sentence of this subparagraph. Such allocable portion is hereinafter referred to as the "additional amortization allowance". If such allowance is made, the renegotiation agreement must provide for the elimination of possible additional excessive profits by the inclusion in the agreement of a clause substantially in the form set forth at paragraph 741.2(8) of these regulations.

(c) Since this procedure is designed to permit the contractor to offset against excessive profits to be eliminated for the fiscal year involved in the renegotiation the additional amortization allowance in anticipation of his renegotiation rebate for such fiscal year, it is not available to any contractor who would not otherwise be entitled to a renegotiation rebate under subsection (a)(4)(D) of the Renegotiation Act for such year. Thus, in the case of renegotiations conducted on a consolidated basis there may be applied in reduction of the excessive profits to be eliminated by any contractor or subcontractor in the consolidated group only the additional amortization allowance applicable to such contractor or subcontractor for such year, and any additional amortization to which any other contractor or subcontractor in the group may ultimately be entitled under the Internal Revenue Code may not be so applied. Also, the additional amortization to which a contractor may be entitled under the Internal Revenue Code for another year and which may be the basis of a renegotiation rebate for such year cannot be applied in reduction of the excessive profits to be eliminated for the year involved in the renegotiation.

(d) The reduction of the amount of excessive profits to be eliminated by the amount of the additional amortization allowance for the year involved in the renegotiation does not correspondingly increase the contrac-

tor's non-excessive renegotiable profits for the purpose of computing the proper adjustment to be made on account of taxes, other than Federal taxes, measured by income, which are attributable to such non-excessive profits.