Laramoiíe, Judge,
delivered the opinion of the court:
Plaintiff seeks judgment on the ground that the defendant has been unjustly enriched as a result of coercion and duress alleged to have been exercised by defendant’s officials, particularly a Mr. Moore, which plaintiff claims induced its execution of the 1944 renegotiation agreement, and by virtue of a mistake of law in interpretation of the covenant against contingent fees contained in the contract. Plaintiff asks this court to exercise its equitable jurisdiction to reform the 1944 renegotiation agreement and to render judgment in behalf of petitioner in the sum of $85,000.
The defendant, by counterclaim, seeks to recover from the plaintiff $143,145.40, consisting of the total of the amounts of $37,256.91 and $105,888.49 paid by the plaintiff to one Mr. Alders in 1942 and 1943, on the ground that those amounts were not legal or proper expenses of performing the plaintiff’s contracts with the defendant during those years and should not have been allowed as such expenses under the renegotiation agreements in 1942 and 1943 or in the termination settlement of plaintiff’s war contracts.
Respecting plaintiff’s petition, defendant maintains: (1) under the Renegotiation Act, 58 Stat. 78, the Court of Claims is without jurisdiction to entertain suits to set aside or reform agreements entered into pursuant to that act; (2) under section 403(c) (4) of the Renegotiation Act, supra, renegotiation agreements were conclusive according to their terms, and could not be set aside, even in a proper forum, except upon “a showing of fraud or malfeasance or willful misrepresentation of a material fact.”
While we believe there is no doubt that the exclusive jurisdiction is within the Tax Court to set aside or reform agreements entered into pursuant to the Renegotiation Act, supra, another reason exists which compels this court to hold that plaintiff cannot recover on its petition. Section 403 (c) (1) of the Renegotiation Act, supra, provides for the making of *379 agreements respecting renegotiation of war contracts. Section 403(c) (4) provides:
For the purposes of this section the Board may make final or other agreements with a contractor or subcontractor for the elimination of excessive profits and for the discharge of any liability for excessive profits under this section. Such agreements may contain such terms and conditions as the Board deems advisable. Any such agreement shall be conclusive according to its terms; and except upon a showing of fraud or malfeasance or a willful misrepresentation of a material fact, (A) such agreement shall not for the purposes of this section be reopened as to the matters agreed upon, and shall not. be modified by any officer, employee, or agent of the United States, and (B) such agreement and any determination made in accordance therewith shall not be annulled, modified, set aside, or disregarded in any suit, action, or proceeding, [p. 84]
In the instant case an agreement was entered into between plaintiff and the District Price Adjustment Section at Chicago, Illinois, acting on behalf of the War Contracts Price Adjustment Board, as provided for in section 403(c)(1), supra.
Thus we are called upon to decide whether the agreement was induced by fraud or malfeasance or a willful misrepresentation of a material fact. In the absence of such a showing, of course, under the statute the agreement cannot be reopened or modified by any officer, etc., of the United States, nor could the agreement be annulled, modified, set aside, or disregarded in any suit, action, or proceeding.
The findings of the commissioner which are adopted by the court, are conclusive on the subject. It is found as a fact, following a recitation of all the proceedings and facts relating to the signing of the renegotiation agreement that the evidence summarized in the findings does not sustain a finding that plaintiff’s acceptance of the 1944 renegotiation agreement was induced by duress or coercion or by malfeasance on the part of the Government’s representatives at the June 1, 1945 meeting.
Plaintiff, of course, has excepted to the findings of fact. Plaintiff’s argument largely is that the findings are not supported by the evidence, or that the evidence leans in an *380 other direction. In most instances, plaintiff has not pointed to an identifiable reference to the record which is provided for in Rule 46(c) of the Rules of this court. However, the gravamen of plaintiff’s case seems to be that Mr.. Hugh D. Moore, a Government negotiator, allegedly on June 1, 1945, represented to the plaintiff that plaintiff would have to forego tax credits provided for in 26 U.S.C. § 8806 (1989 I.R.C.) (1952 Ed.), and the Renegotiation Act, sufra, unless it signed the renegotiation agreement for 1944. Plaintiff contends that Moore “only misrepresented the regulation respecting tax credits,” and that “this was the only misrepresentation that was needed to serve Moore’s purpose at the moment.” Plaintiff then says “that purpose was to force an agreement on plaintiff to which plaintiff otherwise would not have assented.”
The short answer to this contention of plaintiff is that not'only was plaintiff represented by competent counsel who knew or- could have ascertained the provisions of the Internal Revenue Code and the Renegotiation Act, supra, but that plaintiff was well acquainted with the statutes involved. The 1942 renegotiation agreement signed by plaintiff ex-, pressly referred to section 3806 tax credits. Plaintiff’s renegotiation for 1943 likewise provided for tax credits under section 3806. As a matter of fact, in each of those years such tax credits reduced the actual renegotiation refund of excess profits. Moreover, plaintiff signed the renegotiation agreement after several conferences and months of careful consideration, coupled with consultations with its attorney. Furthermore, plaintiff was well aware, long before the signing of the agreement, that Alders’ fees might be totally disallowed. Therefore, it was no real surprise to plaintiff when the fees were actually disallowed.
In summary, all the details of the Renegotiation Act. and regulations and the provisions of section 3806 of the Internal Revenue Act were clear and, if not known to the plaintiff, were readily obtainable. Furthermore, it seems highly unlikely that either Mr. Moore, the Government negotiator, or the District Price Adjustment Board at Chicago would willfully mislead plaintiff to its disadvantage.
*381 As a matter of fact, plaintiff’s concept of duress is not sustained by the decisions of this court. For instance, in the case of Fruhauf Southwest Garment Co. v. United States, 126 Ct. Cl. 51, the court held that the legal meaning of economic duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will. No such showing has 'been made in this case.
In the case of Du Puy v. United States, 67 Ct. Cl. 318, 381, this language was used:
* * * In the case at bar the plaintiff, during the negotiations for settlement, was represented by able attorneys, and both they and the plaintiff knew before the settlement was signed everything that they know now. In order to successfully defend on the ground of force or duress, it must be shown that the party benefited thereby constrained or forced the action of the injured party, and even threatened financial disaster is not sufficient. * * *
This was also true in the case at bar. ■ Plaintiff was represented by able counsel; both he and plaintiff knew before the settlement was signed everything they know now.
Consequently, since we cannot ascribe any bad faith either to Mr. Moore or to the District Board, we likewise cannot charge either with malfeasance, fraud or willful misrepresentation of a material fact. In the absence of one or the other, the agreement is conclusive on the parties, and this court does not have jurisdiction to set aside or reform the 'agreement. Accordingly, plaintiff’s petition must be dismissed.
If plaintiff did not believe that payments to Alders were violations of Article 11 of the contracts, its course was to refuse to sign the renegotiation agreement, petition the War Contracts Price Adjustment Board for review of the unilateral order which would have been issued, and possibly appeal further to the Tax Court.
The remaining question to be decided is whether or not defendant is entitled to recover on its counterclaim. The theory of defendant’s counterclaim is that in 1942 and 1943 plaintiff paid contingent fees to Alders in violation of *382 Article 11 of plaintiff’s war contracts with defendant’s Army Air Forces.
Since plaintiff has filed no reply to defendant’s counterclaim, defendant’s allegations were admitted and required no specific proof under Rules 15(c) and 16 of the Rules of this court. Rule 15 (c) provides:
Effect of Failure To Deny: Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading. * * *
Rule 16(a) provides:
_ Time for Answer and Reply: * * * After service on him of an answer containing a counterclaim or plea of fraud, plaintiff shall have 40 days within which to file a reply to the counterclaim or plea of fraud. * * *
Rule 16 (h) provides:
Waiver of Defenses: A party waives all defenses and objections which he does not present either by motion as hereinbefore provided or, if he has made no motion, in his answer or reply, * * *.
Unquestionably, defendant’s counterclaim is such a pleading to which a responsive pleading is required. Rule 6(a) of the Rules of this court provides:
Pleadings: There shall be a petition and an answer; and if the answer contains a counterclaim or a plea of fraud, there shall be a reply to the counterclaim or the plea of fraud. There shall be such third-party pleadings as are permitted by Rule 19. No other pleadings shall be allowed, except that the Court may order a reply to an answer, or a responsive pleading to a third-party petition or answer. [Cf. Rule 7(a), Federal Rules of Civil Procedure; Curry v. Pyramid Life Ins. Co., 271 F. 2d 1.]
Unquestionably plaintiff did not, within the time specified by the rules of this court, file a reply to defendant’s counterclaim, and unquestionably under Rule 16(h), supra, plaintiff has waived all defenses and objections. Unquestionably, under Rule 15(c), supra, the effect of plaintiff’s failure to deny is to admit the averments of the counterclaim. (Cf. Rule 8(d), Federal Rules of Civil Procedure; Atkinson v. Atkinson, 167 F. 2d 793.)
*383 The rules are clear and were not made to be broken. Courts must necessarily operate under rules, and we can find no excuse or reason why this plaintiff should be given the right of an exception.
Plaintiff did belatedly attach a “reply” to its objections to defendant’s requested findings. This was not authorized by the court. Nor is there a journal entry containing any mention of this “reply.” As a matter of fact, this so-called “reply” was filed long after proof was closed and could not operate to deny allegations which are deemed, under the rules, to be admitted.
Plaintiff’s attorney in the memorandum in opposition to defendant’s requested findings, filed February 13, 1961, admits that a reply is necessary to the counterclaim, but seeks to excuse failure to reply by stating that he erroneously referred to the rules and thought no reply was necessary. This we do not think can be construed to relieve plaintiff of the effect of the rules. Under plaintiff’s theory, we might just as well discard the rules or hold that they were intended to be meaningless.
In this posture we normally would have to enter judgment for defendant on its counterclaim. However, since, as we held earlier, this court has no jurisdiction over the subject matter of the petition because the renegotiation agreement was not induced by duress, etc., defendant’s counterclaim must also fall. Looney v. District of Columbia, 18 Ct. Cl. 8; The Baltimore & Ohio Railroad Co. v. United States, 34 Ct. Cl. 484; Yale & Towne Manufacturing Co. v. United States, 67 Ct. Cl. 618; The First National Steamship Co., et al. v. United States, 106 Ct. Cl. 601.
While the failure of plaintiff to reply to defendant’s counterclaim is not dispositive of the issue, we discuss the subject because we cannot condone the failure of plaintiff’s attorney to diligently search the rules and abide by them.
For the reasons stated above, defendant’s counterclaim is dismissed.
It is so ordered.
Durfee, Judge; Whitaker, Judge; and Jokes, Chief Judge, concur.
*384 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a Wisconsin corporation. Its principal place of business is Waukesha, Wisconsin; It was organized in 1929 to develop stainless steel processing equipment. By 1941, through extensive work, and with assistance of steel producers, food processors, and others, it had developed and was selling various types of fabricated stainless steel equipment, mostly custom made, including food processing equipment and equipment for use in the oil industry. Wachowitz, its president,-regarded its products as superior to equipment, made of materials other than stainless steel, that had been used before for similar purposes. As a result of this.work, plaintiff, and particularly Wachowitz, had by 1941 developed a substantial fund of expert knowledge concerning the fabrication of stainless steel. Plaintiff was not, however, experienced in volume production and was not set up for production line manufacturing.
• 2. During the years 1941 through 1945, plaintiff entered into some 25 contracts with the United States Government for the manufacture of metal oxygen cylinders for use on aircraft.
3. All plaintiff’s war contracts with the Government contained the following clause:
ARTICLE 11. COVENANT AGAINST CONTINGENT FEES.The Contractor warrants that he has not employed any person to solicit or secure this contract upon any agreement for. a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the .right to annul the contract, or, in its discretion, to deduct from the contract price or consideration the amount of such commission, percentage, brokerage, or contingent fees. This warranty shall not apply to commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business.
*385 4. The plaintiff’s entry into the business of mating metal oxygen cylinders for the defendant came about primarily through the efforts of one Arthur F. Alders. Early in 1941, Alders discovered the defendant’s need for oxygen cylinders. He approached the plaintiff about making them, after several other manufacturers had been unsuccessful in doing so. Without compensation until March 1942, and paying his own expenses, Alders collaborated with the plaintiff in developing arrangements for the plaintiff’s production of cylinders that would meet the defendant’s requirements.
On July 24, 1941, before the execution of any of the contracts between the plaintiff and the defendant referred to in finding 2, Alders was employed by the plaintiff under a contract which remained effective through the year 1944 and which contained the following provisions:
(1) Alders will devote his entire time and ability and concentrate his efforts on: (a) obtaining orders on behalf of Alloy Products from the United Statés Government or suppliers of the Government for said low pressure oxygen system cylinders; (b) aiding Alloy Products in the procurement of the financing, materials, tools, dies, jigs, fixtures, machinery and equipment necessary in the manufacture thereof; (c) acting as liaison between Alloy Products and the United States Government, suppliers of the Government and others in connection with the procuring of said orders, financing, materials, tools, dies, jigs, fixtures, machinery and equipment; and (d) acting as liaison between Alloy Products and the United States Government in connection with the hydrostatic, gunfiring and such other test as the United States Government may require as a condition precedent to accepting said cylinders, to the end that said cylinders, as and when manufactured for the United States Government or its suppliers by Alloy Products, will be manufactured in a manner satisfactory to the Government.
(2) Alloy Products will cooperate with-Alders in his performance of this Agreement and will manufacture said low pressure oxygen. system cylinders and fill all contracts or orders therefor heretofore or hereafter obtained by Alders on behalf of Alloy. Products or by Alloy products from the Government or its suppliers; Provided, however, That Alders shall secure the written approval of Alloy Products to contracts or orders ob *386 tained by Mm in its behalf prior to executing the same on behalf of Alloy Products.
(3) Alloy Products will pay Alders for all services rendered by him hereunder five (5%) percent of the gross amount of all amounts received by it on any and all contracts or orders which Alders or Alloy Products heretofore entered into with or obtained from, or hereafter enters into with or obtains from, the Government or suppliers of the Government, for such low pressure oxygen system cylinders. Payment thereof will be made by Alloy Products to Alders within fifteen (15) days after receipt by Alloy Products of any moneys pursuant to any of such contracts or orders.
5. For 1945 the agreement between the plaintiff and Alders was changed to provide that he would receive compensation for that year, on a noncontingent basis, amounting to $49,200 and consisting of $30,000 salary and $1,600 a month for expenses.
6. During the years when the contract referred to in finding 4 was in effect, Alders was paid the following amounts by the plaintiff:
1942 _$ 37,256.91
1943 _ 105,888.49
1944 _ 85,000.00
He paid his own expenses. The gross amounts paid Alders in 1942 exceeded, but in 1943 and 1944 were less than 5 percent of the gross amounts received by the plaintiff on Government business during those years. In 1943 the amount due to Alders at the 5 percent rate provided by the terms of the contract would have been $122,830.68. In 1944 it would have beeen $172,379. Alders waived the excess in each case, apparently, in part, for reasons of expediency in connection with his own tax obligations and, in part, to mollify objections by Government officials to his employment arrangement sufficiently to facilitate plaintiff’s procurement of a contract then under discussion.
7.In the renegotiation of plaintiff’s business with the defendant during 1942 and 1943, which was settled by two separate renegotiation agreements, executed in 1943 and 1944, the amounts plaintiff paid Alders as compensation in those years, as stated in finding 5, were allowed as costs of plain *387 tiff’s performance of its contracts with the defendant during those years.
8. In the renegotiation of plaintiff’s business with the defendant during 1944, the Chicago Price Adjustment Board (hereafter called the Chicago Board) disallowed all of the $85,000 paid to Alders during that year in reliance on an opinion of counsel that Alders’ contract with the plaintiff violated the Covenant Against Contingent Fees referred to in finding 3. Plaintiff claimed only $80,000 as allocable to renegotiable business.
9. (a) The Chicago Board also determined that $219,596 of profits realized by the plaintiff during 1944 should be eliminated and, coupling this amount with the disallowance of Alders’ compensation, proposed a renegotiation agreemeent providing for disallowance of a total of $304,596 for 1944.
(b) The plaintiff’s obligation under the proposed agreement to refund $304,596, less a customary credit for income taxes, could have been satisfied, in accordance with the practice then in effect, by payment of a total sum of $60,919.20— $15,229.80 on September 1, 1945, $15,229.80 on October 13, 1945, and $30,459.60 on or before December 31, 1945.
(c) The plaintiff objected to the disallowance of Alders’ 1944 compensation. The plaintiff claims, however, that after a meeting June 1, 1945, with Mr. Moore, the negotiator for the Chicago Board, plaintiff’s representatives had the impression, induced by Moore’s statements, that if it did not accept the agreement proposed:
(i) the Government would issue a unilateral order embodying the terms of the agreement, and the case would go to Washington as an “impasse” case;
(ii) in all likelihood, the Price Adjustment Board in Washington would disallow Alders’ compensation, relying upon the same legal opinion as was followed by the Chicago Board;
(iii) the Price Adjustment Board in Washington could also disallow other items which the Chicago Board had allowed, and
(iv) the Government would probably “be disposed,” immediately upon issuance of the unilateral order, to withhold the entire $304,596 from sums then due the plaintiff *388 on invoices currently due or to become due in tbe near future, without provision for installment payments and without credit for income taxes on the amounts disallowed.
. (d) As the negotiator for the Chicago Board knew from the company’s latest financial statements, plaintiff’s capital was and always had been inadequate to meet the requirements of the volume of war work it was doing, its current liabilities exceeded its current assets, and the proposed dis-allowance exceeded the plaintiff’s then current net worth.
(e) For the reasons stated in paragraph (d) of this finding, it was evident both to the plaintiff and to the negotiator for the Chicago Board that if, as a result of the disallowance of about $305,000 for 1944 the plaintiff should have to pay that amount back to the Government within a brief period, either by a direct lump sum payment or through withholding of amounts currently coming due from the Government or then being advanced to it by the Government, it would be unable to meet its current payroll, would have to default on other obligations, and probably would have to discontinue operations and be wound up and dissolved, unless the .Government should choose either to advance enough more to keep it in business, despite the repayments required, or should devise other expedients to keep available the plaintiff’s production facilities, which were highly regarded by the Government’s procurement officials.
(f) Faced with what it claims to have believed to be the alternatives described in paragraphs (c), '(d), and (e), and having neither sought nor obtained any assurance that the impact of the repayment obligation thus anticipated if it did not agree would be softened, the plaintiff chose to execute the renegotiation agreement, and did so on July 10, 1945, but transmitted it with a letter which stated, in part:
* * * As you know, this question of whether or not the _ compensation we paid Mr. Alders has violated Article 11 of our procurement contracts with Wright Field, has never been officially determined and we would like to state .herewith that our acceptance of this Renegotiation Agreement does not in any way mean that we are admitting that the compensation payments we have made to him do violate Article 11 or any other articles of our procurement contracts with Wright Field.
*389 10. (a) The plaintiff here seeks judgment for $85,000 on the ground that the defendant has been unjustly enriched by that amount as a result of coercion and duress alleged to have been exercised by defendant’s officials, particularly Moore, which plaintiff claims induced its execution of the 1944 renegotiation agreement, and by virtue of a mistake of law in interpretation of the Covenant Against Contingent Fees referred to in finding 2.
(b) The defendant, by a counterclaim, seeks to recover from the plaintiff $143,145.40, consisting of the total of the amounts of $37,256.91 and $105,888.49 paid by the plaintiff to Alders in 1942 and 1943, on the ground that those amounts were not legal or proper expenses of performing the plaintiff’s contracts with the defendant during those years and should not have been allowed as such expenses under the renegotiation agreements for 1942 and 1943 or in the termination settlement of plaintiff’s war contracts.
11. The findings hereafter made state the ultimate facts which appear to be pertinent to determination of the following issues raised by the petition and the counterclaim:
(a) Wliether Alders’ employment and compensation under his contract with the plaintiff were in violation of the Covenant Against Contingent Fees;
(b) Wliether the plaintiff’s execution of the 1944 renegotiation agreement was induced by duress or coercion by the defendant’s representatives; and
(c) Wliether the amounts retained by the plaintiff under the 1942 and 1943 renegotiation agreements in respect of Alders’ compensation may now be reclaimed by the defendant under its counterclaim.

The Nature of Alders’ Employment and Compensation

12. In bringing the Government’s oxygen cylinder business to the plaintiff, Alders generated a variety of problems for the plaintiff. On the basis of the whole record, it appears that, in addition to procuring oxygen cylinder business for the plaintiff, Alders assisted the plaintiff substantially and in various ways in meeting these problems.
The Government required oxygen cylinders to be used in aircraft to supply oxygen for members of the aircraft crews. *390 Lightness was a primary consideration, coupled with a capacity to resist dangerous fragmentation in case the cylinder should be punctured by enemy fire or otherwise ruptured. These requirements necessitated, at the outset, development of suitable designs and selection and procurement of suitable materials.
In addition, the manufacture of such cylinders in the volume required by the Government presented the plaintiff with the problem of adapting its manufacturing processes, which previously had been largely confined to manufacture of individual pieces of equipment to customer specifications, to line production of substantial quantities of identical units.
Moreover, plaintiff’s financial resources were inadequate readily to support the manufacturing program essential to meet the requirements of the Government contracts, and required supplementation.
Over and above this, additional factory space and additional equipment, different from that initially available to the company, had to be procured and financed.
13. Alders had little or no part in plaintiff’s direct manufacturing operations and little, if any, part in dealing with technical problems of the sort which Wachowitz’ experience in the fabrication of stainless steel peculiarly fitted him to handle.
Atkinson, then secretary of the plaintiff and now its president, appears to have prepared most of the correspondence, including figures and other data contained therein. Otherwise, Alders appears to have had primary charge of arrangements concerning the plaintiff’s oxygen cylinder program. It appears, on the basis of the whole record, that from the late spring of 1941 through 1945, although his hours and activities were not subject to specific supervision or regulation by the plaintiff, he performed diligently and, to the full satisfaction of the plaintiff and the Government procurement personnel, a wide variety of functions necessary to the effective execution of that program — in addition to the procurement of Government contracts. His activities included helpful cooperation with other manufacturers engaged in attempting to make such cylinders.
*391 14. More specifically, in conformity with the terms of his contract with the plaintiff, Alders’ activities included obtaining orders for the plaintiff from the Government and its suppliers, but were not limited to that function.
Additional functions he performed included the following:
(a) He aided plaintiff in procuring and financing the procurement of machinery and equipment, tools, dies, jigs, fixtures, and other materials and facilities needed for plaintiff’s manufacture of oxygen cylinders, and for the testing of such cylinders.
(b) He made arrangements for tests, both by the plaintiff and by the Government, of oxygen cylinders manufactured by the plaintiff, attended tests, to some extent assisted in the performance of tests, and, as liaison between the plaintiff and the Government, communicated the results of tests and the requirements indicated thereby. These services related to testing included procuring approval of a test firing range so that the plaintiff could test-fire cylinders at Wauke-sha, and getting a machine gun and sight for use in making such tests.
(c) He located sources of supply of needed materials, arranged for priorities, and for the purchase and delivery of materials. In some cases, he personally procured and delivered materials. He performed similar services in connection with the procurement of tools, dies, jigs, fixtures, and other production equipment.
(d) Although the substance of contributions to design is difficult to evaluate, there is some evidence that Alders contributed some ideas to plaintiff’s initial development of suitable designs for cylinders of the sort required by the Government and to later improvements in the design of such cylinders.
(e) He performed the varied, and sometimes nebulous, functions of liaison between the plaintiff and the Government. It is difficult to distinguish between the function of mere messenger and the more valuable function an intelligent and sophisticated intermediary may perform by interpreting correctly and communicating accurately the views of the purchaser and the supplier concerning products such as those involved here, which were subject to continuous testing and *392 development, used critical materials and were required to meet exacting specifications. On the whole, it appears that Aiders’ performance was of the latter sort. Among his liaison functions he delivered signed contracts, communicated between plaintiff and the Government regarding specifications and modifications, made up spare parts lists, reported to the Government on production, arranged for security clearances, and for salary increases for plaintiff’s office help, and for the necessary approvals for the building of a new plant.
(f) He took an active part in arranging the financing necessary for the plaintiff’s manufacture of the oxygen cylinders, including arrangements for advance payments by the Government and for expediting payments which the plaintiff needed promptly to carry on its operations with its limited financial resources.
15. On the basis of the whole record, it seems clear that, in addition to procuring orders from the Government on behalf of the plaintiff, Alders contributed materially, in a variety of ways, to the effectiveness of plaintiff’s successful effort to perform its contracts with the Government for the manufacture of oxygen cylinders.
16. There is some indication that before his employment by the plaintiff, Alders had been engaged in efforts to sell other products to the Government and had represented other companies. Indeed, he had procured, on behalf of other companies, orders from the Government for a few oxygen cylinders which did not test out successfully. This evidence indicates that when Alders first came into contact with plaintiff he was engaged in an effort, which had not been wholly successful, to establish himself as a manufacturer’s representative. It seems clear enough, however, that once his association with the plaintiff was firmly established by his contract of July 24, 1941, Alders became and remained exclusively the plaintiff’s employee from that date through 1945, devoted all of his working time to his duties under the contract, and did not act for other companies during that period.
Nor is there evidence that Alders sought to procure business for the plaintiff other than orders for oxygen cylinders *393 to be supplied either directly to the Government or to other suppliers of the Government.
17. None of plaintiff’s sales personnel was ever employed on any basis other than a percentage commission basis.
18. Further essential details of the nature of Alders’ employment with the plaintiff are perhaps most succinctly summarized in the plaintiff’s responses dated July 3, 1944, to specific questions asked in a letter dated June 24,1944, from Moore, the negotiator for the Chicago Board, inquiring about Alders’ status. The pertinent inquiries made in that letter, and plaintiff’s replies (in parentheses) are as follows:
On page 17 of the narrative report submitted to this office in connection with renegotiation for the year ended December 31,1943, you list as the only employee of your company who received more than $10,000 during the year under review, Mr. Arthur F. Alders. You also state that Mr. Alders received $105,888.49 for his services during 1943 and that he devoted his full time to the company’s business.
In Exhibit 1, Item 2 “Statement of Segregation of Operations Year Ended December 31, 1943” heretofore submitted by you, this expense item of $105,888.49 has been charged entirely to renegotiable sales.
In the renegotiation of your company it is necessary to determine whether Mr. Alders was an agent or a full-time employee of your company during 1943 in order that it may be determined whether Mr. Alders should be renegotiated personally or whether the reasonableness of the compensation paid to Mr. Alders as a charge against renegotiable sales should be considered in the renegotiation of Alloy Products Corporation.
In connection therewith we desire answers to the following questions:
1. Was Mr. Alders considered by the company to be an employee or an agent of the company during 1943 ? If an employee, what control did the company have over Mr. Alder’s [sic] services? (Mr. Alders was considered by the company as an employee during 1943. The company had such control over his services as were covered by written contract.)
2. How many 40-hour weeks did Mr. Alders devote to the affairs of Alloy Products Corporation during 1943 ? (Mr. Alders’ services were not covered by any set time of 40 hours per week. The matter of time was at his own disposal.)
*394 3. Did Mr. Alders devote his time exclusively to the business of Alloy Products Corporation during 1943? (To the best of our knowledge and belief, Mr. Alders devoted his time exclusively to the business of Alloy Products Corp. during 1943.)
4. Did Mr. Alders receive, in 1943, wages, commissions, or compensation for services rendered,_ from any other source than Alloy Products Corporation? (To the best of our knowledge and belief Mr. Alders received no remuneration from any other source during 1943.)
5. Were Federal income taxes withheld by the corporation from Mr. Alder’s [sic] compensation in 1943? (Federal income taxes were withheld during 1943 from Mr. Alders’ compensation.)
6. Did the corporation pay, in addition to commissions, Mr. Alders [sic] expenses during 1943 ? _ If so, what was the amount thereof and under what item, of expense are such expenses charged on the corporation profit and loss statement. (No expenses were paid by Alloy Products Corp. for Mr. Alders.)
7. If Mr. Alders paid his own expenses and the corporation withheld Federal income taxes from his compensation, how was the amount withheld for such taxes computed? (The amount on which Federal income taxes were withheld was computed on gross earnings less an estimate of expenses as furnished by Mr. Alders. Such estimate for 1943 was in the amount of $20,000.00.)
8. Did the corporation pay Social Security taxes during 1943 on Mr. Alder’s [sic] compensation? (Yes.)
9. Was Mr. Alders, during 1943, included as an employee of the company under the Wisconsin unemployment compensation tax payments? (No. As Mr. Alders is not a resident of the State of Wisconsin and his services were construed as being rendered outside the State of Wisconsin.)
19. Under Alders’ contract with the plaintiff, his compensation was measured exclusively by a percentage of the gross amounts received by the plaintiff on Government contracts for oxygen cylinders. The amount he was entitled to receive was not affected by the amount of time he spent on the job, the nature of the duties he performed, the quality of his performance, or the amount of expenses he incurred, except as these factors were reflected indirectly through the amounts received by the plaintiff as payment under contracts with the Government for oxygen cylinders.

*395
Defendant's Knowledge of the Terms of Alders' Employment and Compensation

20. Moore, the negotiator for the Chicago Board, testified that renegotiation was based on information furnished by the companies being renegotiated and that, although he was informed about the terms of Alders’ employment as early as 1943, when plaintiff’s 1942 business was being renegotiated, he was not aware until 1945, when the 1944 business was being renegotiated, that plaintiff’s contracts with the Government contained the Covenant Against Contingent Fees quoted in finding 3. There is no substantial evidence to the contrary, although it is difficult to believe that contracts were renegotiated without inquiry being made as to their terms. Whatever Moore’s personal knowledge of plaintiff’s contracts may have been, however, it is obvious that there were officials of the Government who were aware, from the time the contracts were executed, that they contained such covenants and there is no evidence that, if the contracts were not readily at hand for Moore’s examination, he could have ascertained their terms without difficulty had he considered it important to do so, either from the plaintiff or from Government procurement officials with whom he was in frequent communication.
21. (a) Begardless of whether Moore or the Chicago Board knew, or by the exercise of reasonable diligence could or should have known, when the plaintiff’s 1942 and 1943 business was renegotiated, that the plaintiff’s contracts with the Government contained covenants against contingent fees, the Board appears to have given no consideration in those years to the question whether the contingent nature of Alders’ compensation conflicted with such covenants. Instead, the Board and its negotiator focused on the question whether the amount he received was excessive.
(b) The $37,000 paid Alders in 1942 was not found to be excessive even though it greatly exceeded Wachowitz’ compensation, as president. The administrative report of the 1942 renegotiation discussed Alders’ compensation under the heading of “Selling and Advertising Expenses.” It described the $37,000 paid to him that year as commissions paid *396 under the terms of the written agreement of July 24, 1941. That agreement is specifically described as providing for a commission of 5 percent on gross sales to the Government. ■The report summarized the services performed by Alders beginning in 1941 in connection with the oxygen cylinder business of the company. It concluded that .the $87,000 represented a fully justified payment to Alders for expenses he incurred and services he performed for more than 2 years with the company and the Government.
The 1942 report stated, however, that the company’s.attention was called to the probably excessive commissions that would accrue to Alders during 1943 under his contract with the company, and to the provisions of the Act which required the officials in charge of renegotiation to .disallow excessive costs charged against renegotiable sales, and said that the plaintiff was told that any commission paid to Alders in excess of a reasonable amount for services rendered and actual expenses incurred would probably be disallowed.
22. The report on the 1943 renegotiation, which was conducted in 1944, similarly discussed Alders’ compensation of $106,000 for 1943 in some detail, likewise under the heading of “Selling and Advertising Expenses.” The question of conflict with the covenants against contingent fees was again ignored. Plere, too, the question considered was whether the compensation paid Alders was excessive. The terms of Alders’ contract with the plaintiff were again mentioned and the report referred to warnings, given the plaintiff in 1943, in connection with the 1942 renegotiation, that Alders’ commissions would result in excessive compensation to Alders which might be disallowed in the 1943 renegotiation. The report mentioned also that the original contract had not been terminated or changed but said that Alders had waived $20,000 out of $126,000 commissions, accrued to him in 1943. The report concluded that Alders “renders valuable services to the company and, in turn, to the Government,” but that, through its failure to terminate or adjust the contract, the company had allowed excessive costs to be incurred relative to its renegotiable business.
. The report stated, however, that “After conferring with the Bureau of Internal Revenue, the negotiator estimated *397 that the company will be allowed these commissions as an item of expense by the Bureau.”
The resulting renegotiation agreement for 1943, executed October 23,1944, allowed the plaintiff $106,000 as “Compensation and Expense” paid Alders “based on amount of Government business secured by him.”
23. The renegotiation agreements for 1942 and 1943 each contained a Covenant Against Contingent Fees, the terms of which are as follows:
The Contractor warrants that it has not employed any person to solicit or secure this agreement upon any agree ment for a commission, percentage, brokerage, or contingent fee. Breach of this warranty shall give the Government the right to annul this agreement.
There is no evidence that Alders had any part in the solicitation or securing of the renegotiation agreements.
24. In supplying renegotiation information in response to a questionnaire concerning the fiscal year ended December 31, 1943, the plaintiff, in response to the question “Did the Contractor pay any commissions for obtaining direct Government business? If so, explain,” answered “No — Except as compensation to Arthur F. Alders is based on amount of business secured by him, which business during 1943 was' exclusively Government business.”

Plaintiff's Knowledge that Alders' Compensation Might be Totally Disallowed

25. (a) The prospect of total disallowance of Alders’ compensation on the ground that, in the view of the Government officials responsible for administering plaintiff’s contracts, it violated the Covenant Against Contingent Fees, was raised long before the June 1, 1945, meeting at which the basic terms of the proposed 1944 renegotiation agreement were announced to the plaintiff.
(b) On October 24, 1944, the day after execution of the 1943 renegotiation agreement, a Government investigator, Capt. William A. Little, was at Wachowitz’ office in Wauke-sha inquiring about Alders’ relationship with the plaintiff. On October 28,1944, plaintiff was informed by a letter from the Area Contracting Officer of the Air Technical Service *398 Command that, as Contracting Officer charged with, administering plaintiff’s Air Corps contracts, he was required to make an administrative determination as to whether plaintiff’s employment of Alders was in violation of Article 11, the contingent fee clause of plaintiff’s contracts. The letter invited plaintiff to present any facts concerning this question additional to those it had previously given to Capt. Little.
(c) From that date on, until after the execution of the 1944 renegotiation agreement on July 10,1945, various manifestations of the Government’s objections to Alders’ contract, based on the belief that it was in conflict with the Covenant Against Contingent Fees, were the subject of repeated communications between the plaintiff and representatives of the Government. Questions concerning ways to modify Alders’ contract so as to satisfy Government procurement officials that they could continue to do business with the plaintiff and to make advances needed to finance its continued operation had been under discussion with the plaintiff even before October 1944, and early in 1945, his contract was changed, as indicated in finding 5, to eliminate, for 1945, the provision for contingent compensation. The possibility that advance payments might be held up because of the alleged conflict between Alders’ employment and the Covenant Against Contingent Fees in the procurement contracts was apparent to the plaintiff through such discussions.
(d) During the early part of 1945, the possible responsibility of Government officials to take measures to procure refund by the plaintiff to the Government of $228,145.40, paid to Alders under the contract less tax credits, was debated among Government officials and various expedients for accomplishing such refunds, without destroying or seriously impairing plaintiff’s capacity to supply the products it was making under its contracts, were under consideration. The extent to which plaintiff was kept currently informed concerning the substance of these discussions is not clear from the record, although it does appear that the subject was discussed in some detail at a conference January 10, 1945, attended by Wachowitz, Atkinson and Jacobson, the attorney for the plaintiff.
*399 (e) There is no question, however, that plaintiff was informed before the conference on June 1,1945, when the terms of the proposed renegotiation agreement were made known to it, that Alders’ compensation for 1944 might be completely disallowed because the Chicago Board had been advised that Alders’ employment contract was in conflict with the Covenant Against Contingent Fees in plaintiff’s production contracts.
26. (a) On January 29, 1945, Gaylord A. Freeman, Jr., a member of the Chicago Board, in a letter to Lt. Col. Harry E. Green, Price Adjustment Branch, Control Office, Army Air Forces at the Pentagon in Washington, reviewed the various steps that had been considered by the procurement personnel to deal with the problems they believed to be presented by the payments that had been made to Alders and requested Green’s advice, as well as that of the Washington Board, concerning the method the Chicago Board should follow in dealing with the payments made to Alders in 1942, 1943, and 1944.
(b) In stating the facts, Freeman did not describe in detail the varied functions Alders performed for the plaintiff. He merely said that the plaintiff had agreed that it would pay Alders a commission of 5 percent of all amounts plaintiff received from Government contracts Alders obtained for it and that “Subsequent thereto Mr. Alders obtained many prime contracts with the Army Air Forces (mainly small oxygen tanks).”
(c) The Board’s reply to Freeman’s inquiry, dated February 24,1945, was as follows:
Subject: Alloy Products Corporation
1. [Reference is made to your memorandum of 6 February 1945 and the memorandum of the Chicago Price Adjustment Section enclosed therewith, relative to certain commissions paid by subject contractor. It is suggested that the Price Adjustment Section be advised as follows:
(a) Since renegotiation agreements have been entered into for 1942 and 1943, nothing can be done, so far as renegotiation is concerned, about commissions allowed in the renegotiation of such years, in the absence of fraud or wilful [sic] misrepresentation.
*400 (b) It is believed that the commissions paid or incurred during 1944, in violation of the terms of the procurement contracts held bj the contractor, should be disallowed as costs. Subsection (a) (4) (B) provides that “no item of cost shall be charged to any contract * * * to the extent that * * * such item is unreasonable or not properly chargeable to such contract”. It would seem that contingent fees incurred or paid in violation of specific contract provisions inserted in the Government’s interest are not properly chargeable or allocable to such contract or contracts.
(c) If procurement authorities obtain from the contractor a refund of any commissions paid or incurred in 1944 under the provision in the contracts allowing the Government to deduct the amount of such commissions from the contract price, such refund should be considered, in the renegotiation of such year, as a reduction in sales.
2. The above comments pertain to the treatment of this problem only insofar as renegotiation is concerned. The action to be taken under the provisions of the original contract is a matter which must be determined by procurement authorities. Any refund obtained by procurement authorities, covering the 1942 and 1943 years, would appear to be attributable to those years and not to 1944 insofar as renegotiation is concerned.
It was upon this opinion that the Chicago Board relied in insisting that the payments made to Alders in 1944 should be disallowed in the 1944 renegotiation.
27. On April 27,1945, Wachowitz told Moore by telephone that plaintiff had decided to refuse to make refunds because of payments of commissions to Alders upon advice of counsel who, after taking up the matter with officials in Washington, had decided no violation of contracts had been made in paying commissions to Alders.
■ 28. A meeting was held May 2, 1945, for the purpose of reaching an agreement, if possible, as to the amount of plaintiff’s excessive profits for 1944. Wachowitz, Atkinson, Adamek (plaintiff’s accountant), Moore, the negotiator for the Chicago Board, and Miller, a financial analyst, were present. At this meeting, Miller explained that the proposed disallowance of Alders’ commissions of $80,000, as a cost not properly chargeable to renegotiable sales, was based upon an opinion submitted by the War Contracts Price Ad *401 justment Board in Washington to the effect that such' commissions were contrary to the contract provision with the Government.
Moore explained the failure to disallow commissions paid to Alders in 1942 and 1948 on the grounds—
(1) that each year was treated independently in renegotiation and action taken in prior years is not a precedent for subsequent years, and
(2) that the existence in the plaintiff’s procurement contracts of the Covenant Against Contingent Fees for securing Government contracts was not known at the time when the agreements for 1942 and 1943 were reached.
Plaintiff’s representatives persisted in their objection to the disallowance of Alders’ compensation and requested additional time to discuss the matter with plaintiff’s board of directors and to submit additional facts concerning this and other points of disagreement. -
29. Between May 2 and June 1,1945, Moore and the plaintiff were in communication with each other from time to time about the terms of the proposed renegotiation. Plaintiff persisted in its position that the arrangements for Alders’ compensation fell within the exceptions stated in -the Covenant Against Contingent Fees and also asserted that the amount of refund proposed would work a hardship on the plaintiff by further depleting its already unsatisfactory working capital.
30. At a meeting June 1, 1945, also held for the purpose of reaching an agreement on the amount of excessive profits for plaintiff’s renegotiable sales for 1944, the same persons were in attendance as at the May 2 meeting described in finding 28. ■ ■
' Plaintiff was informed that its renegotiation liability would amount to $305,000 and would include disallowance of the compensation paid to Alders.
Wachowitz stated that the proposed disallowances were acceptable to the plaintiff except the disallowance of Alders’ compensation. He indicated a disposition not to accept the proposed renegotiation agreement or to accept only with reservations, although he undertook to submit to the Alloy *402 Board the proposal that a total of $305,000 should be refunded.
31. (a) The main basis of plaintiff’s claim that the 1944 renegotiation agreement is reviewable is that statements made by Moore at the June 1, 1945, meeting concerning the alternatives to plaintiff’s agreement to the proposed renegotiation liability amounted to duress and coercion that led to plaintiff’s ultimate execution of the renegotiation agreement.
(b) According to plaintiff, Moore, at the June 1, 1945, meeting, represented to the plaintiff that if it would not accede to the terms proposed, the consequences listed in finding 9(c) would or might ensue.
(c) The evidence is in conflict as to just what Moore said at the June 1, 1945, meeting. According to Atkinson and Adamek who were present, his statements were, in substance, those listed in finding 9 (c).
Moore denied making any such statements to the plaintiff’s representatives either at the June 1, 1945, meeting or at any other time. The following excerpt from Moore’s testimony summarizes the essence of his recollection about what occurred:
Q. Was it the practice of the Price Adjustment Board to recommend withholding of payments to the contractor?
A. The Price Adjustment Board in Washington?
Q. No, in Chicago.
A. We had no authority to withhold payments.
Q. That is what I mean. Did the District Price Adjustment Section in Chicago, or Board, have any authority to issue unilateral orders?
A. No, sir.
Q. Did it have any authority to finally determine impasse cases ?
A. It wasn’t necessary to determine those. An impasse case is one in which you couldn’t reach an agreement with the contractor.
Q. What happened in the event that you were unable to reach an agreement with the contractor ?
A. The files were sent to Washington and the contractor was told that renegotiation would be continued with the Washington office.
Q. Did you represent to the Alloy Products Company, or anyone else to your knowledge represent to *403 Alloy Products Company that any different procedure would be followed if Alloy did not agree to the proposal of $305,596 or $305,000?
A. No, sir. In other words, if we couldn’t agree with Alloy they could carry it up to the Board in Washington, and we always explained to these contractors that controversies were carried to Washington, that a unilateral determination was made by the Board in Washington and they could then appeal to the Tax Court who could consider the case de novo, in other words.
(d) Upon consideration of all the evidence about what took place at the June 1, 1945, meeting, the inference is reasonably clear that plaintiff’s representatives inquired about what might happen if they should refuse to accept the terms of renegotiation proposed, and defendant’s representatives undertook to answer their inquiries according to their understanding of the regulations. The evidence does not, however, show that Moore did any more than attempt to summarize the effect of the regulations. Except for the possibility that he might have misstated the effect of the law and the regulations which provided for tax credits regardless of whether the liability was fixed by agreement or by order, or that plaintiff’s representatives might have misunderstood what he said about tax credits, plaintiff’s version of the impression its representatives received from the discussion does not differ substantially from possibilities that actually existed under the regulations.
(e) According to the regulations,[1] in case an agreement was not reached:
(i) the case would then be treated as an “impasse” case;[2] no reasonable basis is apparent for concluding that Moore’s saying so amounted to duress or coercion.
(ii) the Washington Board had authority, upon review of a determination of the amount of excessive profits, to *404 reach a determination less than, equal to, or greater than the determination reviewed.[3]
Thus the Washington Board had the power to disallow items which the Chicago Board had proposed to allow. A mere statement by Moore of the possibility that it might exercise that power cannot reasonably be regarded as a coercive threat.
(iii) the prospect that the Washington Board would disallow Alders’ compensation, following the opinion,, then recently issued, to the effect that Alders’ compensation arrangement violated the Covenant Against Contingent Fees appears, in retrospect, as it must have appeared at the time, a genuine and likely possibility. If Moore described it as a possibility or even as a probability at the June 1,1945, meeting, his doing so can scarcely be regarded as a coercive threat, or, indeed, as more than a realistic appraisal of the probabilities;
(iv) the regulations recognized the practice of providing for elimination of excessive profits fixed by a renegotiation agreement over a period of time, by acceptance of refunds in installments or by other arrangements,[4] but the same section of the regulations, which bears the caption “No delay in elimination of excessive profits determined hy order,” also contained the following provision:
* * * if excessive profits are determined by order, no provision will be contained in such order for deferment of the obligation thereby created or any part thereof. The collection of the amount called for by such an order will be effected in accordance with the general principles governing the enforcement and collection of obligations owing to the United States as supplemented by the special powers and procedures contained in the Renegotiation Act.
Accordingly, if Moore stated that payment of the renegotiation obligation determined by order would not, or might not be susceptible to payment in installments, as he had proposed that the liability determined by agreement would be, he was doing no more than pointing out a real likelihood *405 under tbe applicable regulations. His doing so cannot be regarded as duress or coercion.
(y) the regulations also contained authorization to eliminate excessive profits by withholding amounts otherwise due the contractor.[5]
Accordingly, if Moore mentioned this possibility, he was doing no more than indicating what really might happen under the regulations;
(vi) the statute and the regulations plainly provided for allowance of a credit for Federal income and excess profits taxes in eliminating excessive profits regardless of whether the amount was determined by agreement or by order.[6]
If, as seems unlikely on the basis of the evidence in the record, Moore stated at the June 1,1945, meeting that plaintiff would forego tax credits by failure to accept the proposed renegotiation agreement, the statement was erroneous.
However, as in the case of all of the other statements which plaintiff claims Moore made, the statute and the applicable regulations were publicly available to plaintiff. It could have made its own independent determination of the correctness or incorrectness of any impressions its representatives had received from any representations Moore made on any of these points. Even an erroneous statement with regard to the availability of tax credits, if one was made, cannot be regarded in these circumstances as duress or as having a coercive effect on the plaintiff, which was in a position to make its own independent determination concerning the terms and effect of the regulations.
32. There is in the evidence a basis for a strong inference that the plaintiff knew or readily could have discovered, had it sought to do so, that Government procurement officials were anxious to avoid the impairment of plaintiff’s capacity for war production that would obviously attend an obligation to refund any amount comparable with the aggregate gross amount of the proposed 1944 renegotiation liability, and that consideration already had been given to means of adjusting, in a manner that would have enabled plaintiff to *406 continue in business, the repayment of obligations these officials believed the plaintiff had to the Government as a result of their conclusion that the payments made to Alders violated the Covenant Against Contingent Fees.
Thus it is by no means clear on this record that the plaintiff could not have procured assurances against the destructive consequences which its representatives claim they anticipated as a result of the discussion with Moore at the meeting of June 1,1945, had it taken the trouble to seek such assurances. There is no evidence that it made any effort to do so.
33. The plaintiff did not sign the renegotiation agreement until July 10,1945,40 days after the meeting of June 1,1945. There is no evidence that during this interval the plaintiff made any independent inquiry about the effect of a unilateral order in an “impasse” case, either by reference to the regulations or by inquiry of those agencies of the Government responsible under the regulations for the decisions required, especially those concerning tax credits and installment payments, and withholding. Fiad it done so, it could readily have dissipated any misimpressions that might have been created by anything Moore said at the June 1,1945, meeting, confirmed any impressions, so generated, that were correct, and made its decision, accordingly, whether to accept the proposed renegotiation agreement or the alternative risks and remedies that were available under the. statute and the regulations if it refused to agree.
34. The evidence summarized in the foregoing findings does not sustain a finding that plaintiff’s acceptance of the 1944 renegotiation agreement was induced by duress or coercion or by malfeasance on the part of the Government’s representatives at the June 1, 1945, meeting.
35. The plaintiff signed the 1944 renegotiation agreement on July 10, 1945, pursuant to authorization of its board of directors, asserting in its letter of transmittal, as indicated in finding 9(f), its continued denial that the payments made to Alders violated the Covenant Against Contingent Fees or any other articles of its procurement contracts.
36. The Chicago Board, on July 12, 1945, sought and, under date of July 23, 1945, received, advice of the Wash *407 ington Board that plaintiff’s denial in its transmittal letter that the payments made to Alders were in violation of the Covenant Against Contingent Fees was not such a reservation as would preclude execution of the agreement on behalf of the Government.
37. On August 18, 1945, the 1944 renegotiation agreement was executed on behalf of the Chicago Board.
3,8. On September 1,1945, plaintiff made its first payment of $15,229.80 under the agreement and, on October 13, 1945, made the second such payment. Plaintiff withheld the third and final payment of $30,459.60, due December 31,1945, because of a controversy that had arisen in the meantime in the course of proceedings for termination of its war contracts, wherein the Government had demanded immediate payment by the plaintiff of all of the $228,145.40 it had paid Alders on the basis of an administrative determination that Alders’ 1941 employment agreement, under which that amount had been paid, violated the Covenant Against Contingent Fees and should be recovered in the termination settlement.
39. After an unsuccessful effort to enjoin collection of the $228,145.40 through action in the United States District Court, plaintiff appealed this determination to the Army Board of Contract Appeals. After hearing, the Board of Contract Appeals decided, on October 1, 1947, that the payments to Alders did not violate the Covenant Against Contingent Fees, and that there was no valid legal basis in Article 11 of the plaintiff’s procurement contracts for withholding the $228,145.40 from the amounts otherwise due the plaintiff. No appeal was taken from the decision of the Army Board of Contract Appeals. The last payment of $30,459.60, due from plaintiff under the 1944 renegotiation agreement, was deducted in final settlement of its termination claims.
40. On July 27, 1949, the plaintiff asked the War Contracts Price Adjustment Board in Washington to reconsider the 1944 renegotiation agreement on the ground of error as a matter of law and called attention to the opinion of the Board of Contract Appeals mentioned in finding 39. On August 25,1949, the War Contracts Price Adjustment Board denied plaintiff’s request, saying, in part:
*408 Section 403(c) (4) of the Eenegotiation Act of 1943 provides, in pertinent part:
“Any such agreement shall be conclusive according to its terms; and except upon a showing of fraud or malfeasance or a willful misrepresentation of a material fact, (A) such agreement shall not for the purposes of this section be reopened as to the matters agreed upon, and shall not be modified by any officer, employee, or agent of the United States, and (B) such agreement and any determination made in accordance therewith shall not be annulled, modified, set aside, or disregarded in any suit, action or proceeding.” [Underscoring supplied.]
The opinion of the Army Board of Contract Appeals has been carefully studied. At the time of the conclusion of the 1944 renegotiation it was the opinion of the Government that the payment of Alder’s [sic] salary was in violation of the Contractor’s procurement contracts, and the renegotiating agency therefore proposed a settlement based on a disallowance of such salary for 1944. This proposal was accepted by your client even though, as the transmittal letter states, it was well known that there had been no official determination as to the legality of the payment of Alder’s [sic] salary. Any appeal from the Contracting Officer’s disallowance of the 1944 salary does not come within the jurisdiction of this Board, and there is no showing of fraud or malfeasance or a willful misrepresentation of a material fact as required by Section 403(c) (4) as aforesaid.
It should also be pointed out that, even though the renegotiating agency had assumed Alders’ salary for 1944 to be legal expenditure for renegotiation purposes, it would not necessarily follow that the entire amount would have been allocated to renegotiable business. Such salary was considerably larger in 1944 than other years and a substantial portion could easily therefor [sic] have been regarded as excessive and allocated to non-renegotiable business. It is also quite clear that as a result of the disallowance of Alders’ salary for 1944, the Contractor’s figures presented a much more favorable picture due to the lower salary expense. This point was expressly mentioned in the report of renegotiation in connection with the following [sic] required to be considered by the Eenegotiation Act of 1943. The mention of these considerations is intended to be merely informative, and in no way militates against the finality of the 1944 agreement, which at the time it was executed was mutually satisfactory, and agreed to be so.
*409 It thus appears that your request to reopen this Renegotiation Agreement for 1944 must be disapproved. Had your client not been willing to agree to the dis-allowance of Mr. Alders’ compensation as a charge against renegotiable profits (such agreement being restricted specifically to renegotiation matters), its course was to refuse to sign the agreement, petition the War Contracts Price Adjustment Board for review of the Unilateral Order which would have been issued, and possibly appeal further to the Tax Court, if your client still felt aggrieved.
It is regretted that no more favorable action may be be taken on your request.

Facts Relating to the Oowiterclaim,

41. This record contains no evidence of fraud, malfeasance or willful misrepresentation of a material fact in connection with the 1942 or 1943 renegotiation agreements.
42. This record does not show specifically what disposition was made of the claim now asserted in defendant’s counterclaim in the final adjustment of plaintiff’s termination claims.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is, therefore, dismissed.
The court further concludes as a matter of law that the defendant is not entitled to recover on its counterclaim and it will, therefore, be dismissed.

 References hereafter to the reglations are to parts or sections of the Renegotiation Reglations published by the War Contracts Price Adjustment Board, as published1 in the Federal Register, Friday, January 26, 1943 (a photocopy of which appears in the record as defendant’s exhibit 4).

 Regulations : PART 1606 — IMPASSE PROCEDURE, SUBPART B — FAILURE TO AGREE. Sec. 1606.620-1606.626-3. SUBPART C — PROCEEDINGS IN THE TAX COURT. Sec. 1606.630-1606.637.

 Eegulatlons: See. 1601.109-2. Sec. 1606.625-2.

 Regulations: Sec. 1606.626-2.

 Regulations: See. 1606.626-1.

 Sec. 3806 Internal Revenue Code; Regulations: See. 1601.108-6 ; See. 1601.112-2; SUBPART D — RENEGOTIATION AND TAXES. Sec. 1604.440, et seg.; See. 1605.502-4; See. 1606.626-2 (c) ; Sec. 1607.746-1.